## EL PUEBLO *v.* FLORES.

## APELACIÓN procedente de la Corte de Distrito de Mayagüez.

No. 251.—Resuelto en febrero 14, 1911.

APELACIÓN—PROCEDIMIENTO—REGULARIDAD DE LAS ACTUACIONES JUDICIALES.—La regularidad de las actuaciones judiciales ha de presumirse mientras no exista prueba en contrario, y por consiguiente, si el procedimiento seguido ante la corte inferior, en determinados extremos, no constare en la transcripción de autos de la apelación, debe presumirse que el procedimiento seguido ha sido correcto y ajustado a ley.

ID.—CASOS EN QUE FIGURE EL INTÉRPRETE ACTUANDO COMO SUBSECRETARIO.—Si de la transcripción de autos apareciere que en sustitución del secretario, actuó el intérprete de la corte, quien autoriza las actuaciones como subsecretario de la misma, habrá de presumirse su capacidad para actuar como tal, quedando así justificada la legalidad de su intervención, toda vez que el secretario auxiliar es el substituto legal del secretario.

INSTRUCCIONES DE LA CORTE AL JURADO—ASESINATO EN PRIMER GRADO.—En este caso el juez dió al jurado la siguiente instrucción: ''el mero hecho de haber utilizado veneno, ya hace declarar la ley que ahí existía suficiente deliberación y premeditación y que el delito es asesinato en primer grado.'' *Se resolvió* que esa instrucción está ajustada a la ley y que el juez estaba facultado para trasmitirla al jurado y manifestarle que éste estaba obligado a admitir como derecho lo que como tal sostenía la corte.

ID.—APRECIACIÓN DE LA PRUEBA—CREDIBILIDAD DE LOS TESTIGOS.—''El jurado es el juez de la prueba: el jurado es el juez que debe determinar a cual testigo debe creerse.'' Es correcta la anterior instrucción, pues el jurado es el único juez de los hechos y de la veracidad de los testigos, y sólo en casos excepcionales, como cuando el jurado cometa abusos manifiestos de sus facultades en este respecto, el tribunal sentenciador, o el de apelación, anularán el veredicto y concederá un nuevo juicio.

ID.—DUDA RAZONABLE.—Con respecto a la siguiente instrucción *se resolvió* que, aunque puede ser defectuosa en la forma, no es errónea y contiene una explicación comprensible de la verdadera significación de las palabras duda razonable: ''las palabras duda razonable quieren decir lo que dicen, una duda que sea razonable, no quieren decir cualquier duda sino una duda que haría vacilar a un hombre prudente si se tratase de alguna cosa importante de su propia vida.''

ID.—DECLARACIONES DE POLICÍAS Y AGENTES DE LA AUTORIDAD.—Otra instrucción dada en este caso es la siguiente: ''las declaraciones de policías y detectives y en general, de las personas encargadas de investigar crímenes, deben examinarse con más cuidado antes de darles crédito, que las declaraciones espontáneas de un ciudadano desinteresado; esto debe tomarlo el jurado en consideración al pesar el valor de la prueba de cada uno.''. *Se resolvió* que es errónea, pero como el error tiende a favorecer, más bien que a perjudicar al acusado, no puede ser motivo de revocación. Las declaraciones de policías, detectives, etc, deben juzgarse al igual que las de cualquier ciudadano, pues

el hecho de desempeñar tales funciones no vicia su testimonio, que debe ser apreciado comó el de cualquier otro testigo.

PRUEBAS—ADMISIONES DEL ACUSADO.—Manifestaciones hechas por el acusado en cualquiera época, que envuelvan una admisión de su culpabilidad, son admisibles como prueba, si no aparece que fueron obtenidas mediante amenaza o promesa, sino que fueron hechas voluntariamente y sin coacción de clase alguna.

ID.—CASOS EN QUE DICHAS ADMISIONES SEAN PARTE DE LA RES GESTAE.—Manifestaciones hechas en circunstancias tales que las presenten como involuntarias, y que sean inadmisibles como confesiones o admisiones del acusado, son, no obstante, admisibles, cuando formen parte de la *res gestae* por derivarse del hecho principal, ser contemporáneas con su comisión, y servir para ilustrarlo y explicarlo.

ID.—CONFESIONES DEL ACUSADO—CASOS EN QUE CONSTE POR ESCRITO.—Cuando exista una confesión hecha por el acusado, escrita o firmada por él y por él aceptada como su verdadera confesión, entonces debe presentarse como prueba el documento mismo, y solo cuando se demuestra que tal documento se ha perdido o extraviado, o por alguno otra causa legítima no puede presentarse, es que puede admitirse evidencia oral sobre la confesión.

ID.—Para excluir la prueba testifical con respecto a la confesión del acusado, es necesario que se demuestre la existencia de una confesión escrita, hecha en debida forma, pues la circunstancia de que un escribiente del fiscal escribiera las manifestaciones del acusado mientras éste declaraba, no implica que tal escrito se sometiera luego al acusado y que éste lo firmara y aceptara como su propia y verdadera declaración.

ID.—EL JURADO NO VIENE OBLIGADO A ACEPTAR O A RECHAZAR LA CONFESIÓN EN TODA SU INTEGRIDAD.—La regla de que una confesión debe considerarse en toda su integridad, no obliga al jurado a aceptarla o a rechazarla íntegramente, pues el jurado puede y debe creer la parte que estime digna de crédito y rechazar la que no le merezca confianza, y por consiguiente, una instrucción de la corte en este sentido es correcta.

ASESINATO PERPETRADO POR MEDIO DE VENENO.—La muerte ilegal de un ser humano con malicia premeditada perpetrada por medio de veneno, constituye asesinato en primer grado.

Los hechos están expresados en la opinión.

Abogado del apelante: Sr. *Luis Llorens Torres.*

Abogado del apelado: Sr. *Jesús M. Rossy, Fiscal.*

EL JUEZ ASOCIADO, SR. DEL TORO, emitió la opinión del tribunal.

El presente es un recurso de apelación contra una sentencia de muerte. El acta de acusación, dice así:

"En el nombre y por la autoridad de El Pueblo de Puerto Rico. Estados Unidos de América. El Presidente de los Estados Unidos, *ss: El Pueblo de Puerto Rico* contra *Juan Flores Casiano y María del Carmen Meléndez y Justiniano.* En la Corte de Distrito de Mayagüez,

a 24 de febrero de mil novecientos diez. El Fiscal formula acusación contra Juan Flores Casiano y María del Carmen Meléndez y Justiniano, por el delito de asesinato en primer grado (*felony*), cometido como sigue: Los citados Juan Flores Casiano y María del Carmen Meléndez y Justiniano, allá por el 12 de enero del corriente año, 1910 y en el barrio 'Rosario Peñón' del término municipal de San Germán, que forma parte del distrito judicial de Mayagüez, P. R., puestos de acuerdo, voluntaria e ilegalmente, con malicia premeditada y propósito firme y deliberado, asesinaron a Angel Martell por medio de veneno, administrándole al efecto una cantidad mortal de la sustancia venenosa de compuesto arsenical denominada '*rough-on-rats*,' conociendo los acusados que la clase de dicho veneno y la cantidad administrada produciría la muerte y mezclando el mencionado veneno con las bebidas que le dieron y tomó el susodicho Angel Martell, no sabiendo éste que dicho arsénico había sido puesto y mezclado con las bebidas que tomó e ingeriendo de este modo tal cantidad de dicho veneno en su estómago que le ocasionó la muerte a las pocas horas.

"Este hecho es contrario a ley para tal caso prevista y a la paz y dignidad de El Pueblo de Puerto Rico. Firmado: Enrique Lloreda, Fiscal del Distrito.

"La acusación que antecede está basada en el testimonio de testigos examinados bajo juramento, creyendo solemnemente que existe justa causa para presentarla al tribunal. Firmado: Enrique Lloreda, Fiscal del Distrito.

"Jurado y firmado ante mí hoy día 24 de febrero de 1910. Firmado: José Basora y Mestre, Secretario del Tribunal de Distrito de Mayagüez."

El 25 de febrero de 1910 se leyó el documento que precede a los acusados y ambos hicieron la alegación de "no culpables." Luego el acusado Juan Flores Casiano, por medio de su abogado nombrádole de oficio por la corte, pidió ser juzgado separadamente y la corte así lo decretó.

El 1º. de marzo de 1910 se celebró la vista y el jurado, después de oir las alegaciones, las pruebas y los informes y de recibir las debidas instrucciones de la corte, rindió el siguiente veredicto:

"Nosotros los del Jurado y en su representación el Presidente que suscribe, declaramos al acusado Juan Flores Casiano culpable del de-

lito de asesinato en primer grado. Mayagüez, a 10 de marzo de 1910.
Firmado: Jacobo Bravo, Presidente del Jurado.''

La corte dictó acto seguido su fallo y señaló para el pronunciamiento de la sentencia el día 16 de marzo de 1910, en cuyo día compareció el convicto ante la corte y ésta le informó sobre la naturaleza del cargo que se le hizo, sobre las alegaciones de su defensa y sobre el veredicto rendido y le preguntó si tenía alguna razón legal que aducir para demostrar que no procedía dictar sentencia en su contra, y no habiendo presentado razón alguna, lo condenó a la pena de muerte, fijando el día y prescribiendo la forma de la ejecución, de acuerdo con la ley.

Interpuesta apelación contra la expresada sentencia, se suspendió la ejecución de la misma, y, recibida la transcripción del récord en esta Suprema Corte y no teniendo el condenado abogado que lo representara, este tribunal nombró de oficio al Letrado Llorens Torres para que lo defendiera.

Forman parte de la transcripción, las alegaciones, las instrucciones al jurado, el fallo y la sentencia, y una exposición del caso y un pliego de excepciones debidamente aprobados y certificados por el juez sentenciador.

Tanto el defensor del condenado, como el Fiscal de esta corte, presentaron sus alegatos escritos y concurrieron al acto de la vista del recurso informando oralmente en apoyo de sus respectivas pretensiones, a saber: la concesión de un nuevo juicio el primero, y la confirmación de la sentencia el segundo.

Examinaremos los errores que el recurrente sostiene que se han cometido en este caso.

Alega, por vez primera ante esta Suprema Corte, que del acta del *arraignment* no aparece que el juez cumpliera con lo preceptuado en el artículo 141 del Código de Enjuiciamiento Civil, esto es, con preguntar al acusado, en el caso de que compareciera sin defensor, si deseaba la asistencia de un letrado, que tampoco consta del récord que el jurado al retirarse a deliberar fuera debidamente custodiado por un marshal

juramentado al efecto, ni que el veredicto se obtuviera por unanimidad.

El récord guarda silencio con respecto a tales extremos y como no existe prueba alguna afirmativa de que la corte sentendiadora omitiera el cumplimiento de lo dispuesto en el artículo 141 citado, ni de que el jurado no fuera debidamente custodiado al retirarse a deliberar, ni de que el veredicto no fuera la expresión unánime de la voluntad del jurado, debe presumirse que los procedimientos se llevaron a efecto de acuerdo con la ley. Además, en cuanto al veredicto, la forma misma en que está redactado revela que se obtuvo por unanimidad.

Alega el apelante que la sentencia se dictó por el juez en su despacho sin hallarse presente el acusado, y que la corte actuó en el acto del juicio sin secretario.

Los autos no demuestran la certeza de tales alegaciones. Al contrario, de su examen se deduce bien claramente que el convicto compareció en el día expresamente señalado para ello a la presencia de la corte y que ésta le hizo las advertencias y preguntas de ley y lo condenó después de haberse cerciorado de que no tenía razón legal alguna que aducir para obstaculizar el pronunciamiento de la sentencia en su contra, y además que la corte actuó asistida del sub-secretario de la misma. Lo consignado en la página 9 de la transcripción con respecto a que actuó en sustitución del Secretario el Intérprete Francisco R .Flores, debe apreciarse en relación con lo que aparece en la página 4 de la misma transcripción en donde el dicho Francisco R. Flores firma como sub-secretario y con lo dispuesto en la sección 2ª. de la ley creando el cargo de secretario del tribunal de distrito, etc., aprobada el 1º. de marzo de 1904. (Leyes de 1904, pág. 108.)

Sostiene el recurrente que el juez invadió las facultades del jurado al darle la siguiente instrucción: "el mero hecho de haber utilizado veneno, ya hace declarar la ley que ahí existía suficiente deliberación y premeditación y que el delito es asesinato en primer grado."

La instrucción transcrita es de ley, está basada en el artículo 201 del Código Penal y el juez tenía la facultad de darla y de manifestarle al jurado, de acuerdo con lo dispuesto en el artículo 265 del Código de Enjuiciamiento Criminal, que estaba obligado a admitir como derecho lo que como tal sostenía la corte. No existe, pues, invasión alguna de facultades, sino que la corte usó de las que expresamente le confiere la ley.

Tampoco erró la corte al dar la siguiente instrucción: ''El jurado es el juez de la prueba: el jurado es el juez que debe determinar a cual testigo debe creerse.'' Tal instrucción, que debe apreciarse relacionándola con las otras dadas por la corte en este caso, está claramente sostenida por el mismo artículo 265 ya citado y por la jurisprudencia de los tribunales.

''Según tiene resuelto este tribunal, y lo repite ahora, el jurado es el único juez de los hechos y de la veracidad de los testigos. Ellos los ven y los oyen testificar y son los únicos que pueden juzgar con respecto a su credibilidad, y solamente en casos excepcionales, de los cuales hay muy raros ejemplos, cuando un jurado comete abusos manifiestos del poder en este respecto, el tribunal sentenciador, o el Supremo, anularán el veredicto y concederán nuevo juicio.'' (*El Pueblo* v. *Villegas,* decidido por esta corte el 5 de mayo de 1904.)

Al referirse a la *duda razonable,* el juez en sus instrucciones dijo: ''las palabras duda razonable quieren decir lo que dice, una duda que sea razonable, no quieren decir cualquier duda sino una duda que haría vacilar a un hombre prudente si se tratase de alguna cosa importante de su propia vida.'' En nuestra opinión no puede sostenerse que tal instrucción sea errónea. Tal vez pudiera decirse que es defectuosa en la forma, pero ella contiene una explicación comprensible de la verdadera significación de las palabras *duda razonable.*

En el caso de *Hopt* v. *Utah,* citado en el de *El Pueblo* v. *Luisa Nevares,* decidido por esta corte el 1º. de febrero de 1906, después de una amplia consideración de las instrucciones de la corte al jurado con respecto a la *duda razonable,*

dijo el Juez Field: "Dichas instrucciones no son esencial-
mente distintas de las dadas por el Lord Tenterden, según las
repitió y adoptó el Presidente del Tribunal del Fisco, Pollock,
en la causa de *Rex* v. *Muller.* "He oído, dijo el Presidente del
Tribunal del Fisco, dirigiendo la palabra al jurado, al difunto
Lord Tenterden sentar frecuentemente una regla que pronun-
ciaré para vosotros en su propio lenguaje: "No es necesario
que tengais una certeza que no pertenece a ninguna transac-
ción humana. Es necesario solamente que tengais aquella
certeza con la cual debiérais decidir vuestros asuntos propios
más importantes de la vida." No cabe duda de que la cues-
tión que hoy se halla sometida a vosotros—puesto que en-
vuelve la vida del acusado aquí presente—debe considerarse
como de la mayor importancia, pero se os exige solamente que
tengáis aquel grado de certeza con que resolvéis y termináis
vuestros propios asuntos más importantes en la vida. Exigir
más, sería realmente impedir la represión del crimen, que es
la misión que deben cumplir las cortes de lo criminal. (4 Fost.
& Fin., 388-89, note.) Nosotros estamos satisfechos de que
el acusado no fué perjudicado en ningún sentido por las ins-
trucciones de la corte." *Hopt* v. *Utah;* 120 U. S., 430.

Al referirse a las declaraciones prestadas por los policías
que comparecieron como testigos en este caso, el juez senten-
ciador trasmitió al jurado la siguiente instrucción que le
fué sometida por la misma defensa: "que las declaraciones
de policías y detectives y en general a las personas encar-
gadas de investigar crímenes, deben examinarse con más cui-
dado antes de darles crédito, que las declaraciones espontá-
neas de un ciudadano desinteresado; añadiendo el juez: esto
debe tomarlo el jurado en consideración al pesar el valor de
la prueba de cada uno."

La instrucción que precede es errónea, pero el error come-
tido en vez de perjudicar tendió a favorecer al acusado y no
puede en tal virtud servir de base para la revocación de la
sentencia. Las declaraciones de los policías, detectives y per-
sonas encargadas de investigar crímenes, deben juzgarse al

igual que las declaraciones de cualquier otro ciudadano. El hecho de desempeñar tales funciones, no vicia su testimonio. Si el jurado estima que ellos son hombres honrados que dicen la verdad, debe creerlos, y si llega a la conclusión, a virtud de las pruebas presentadas al efecto o de las circunstancias del caso, de que ellos no testifican la verdad, debe rechazar sus declaraciones, procediendo al igual que procede al examinar y pesar el valor de la declaración de cualquier otro testigo.

Examinaremos ahora las únicas excepciones que, según el pliego, fueron tomadas por el acusado; luego estudiaremos las cuestiones levantadas en esta Suprema Corte con respecto a las confesiones del acusado y a la prueba circunstancial, y consideraremos por último si el veredicto es o no contrario a derecho o a las pruebas.

La primera excepción se consigna en el pliego de la siguiente manera: ''El Fiscal procedió a practicar la prueba testifical de cargo y entre otros testigos compareció Juan W. Martí, quien a preguntas del Fiscal contestó: 'Al otro día conduje al acusado a San Germán y hablé con él en el camino; hablamos de los delitos y lo triste que era cometer un delito de esa índole, entonces me dijo: ''mejor lo hubiera asesinado a puñaladas antes que haberlo hecho así por medio de veneno.'' La defensa se opuso a que declarara sobre ese extremo el testigo por entender que la conversación que tuvieron el testigo y el acusado es inmaterial y no forma parte del *res gestae.* El Hon. juez desestimó la objeción de la defensa y la defensa tomó excepción.''

En cuanto al primer fundamento diremos que la materialidad de la declaración era evidente, puesto que envolvía una admisión de su culpabilidad hecha por el mismo acusado. Y en cuanto al segundo, que bien pueden considerarse las manifestaciones del acusado hechas en tales momentos como formando parte de la *res gesta,* pero aún cuando así no fuera, siempre hubieran sido tales manifestaciones del acusado admisibles como prueba, dado que no aparece que se obtuvieron

mediante amenazas o promesa, sino que fueron hechas volun-
tariamente por el acusado en el curso de una conversación.

La expresación *res gesta* o *res gestae* literalmente quiere
decir una cosa o cosas hechas (actos ejecutados). En la ley
de evidencia la fórmula plural *res gestae,* que ha sido de uso
más general, se emplea con frecuencia para designar hechos,
circunstancias, actos o declaraciones contemporáneos que se
derivan del hecho principal y que sirven para ilustrarlo y
explicarlo.

"Mientras que confesiones o admisiones de hechos dè las
cuales puede deducirse culpabilidad, hechas en cualquier
época, son generalmente admisibles, las declaraciones del acu-
sado en su contra pueden admitirse como partes de la *res
gesta* aún cuando fueran inadmisibles como confesiones o ad-
misiones por haber sido hechas en circunstancias que las hu-
bieran presentado como involuntarias."

24 Am. & Eng. Encyc. of Law, p. 661 y 678..

La otra excepción tomada se consigna en el pliego así:

"También compareció el testigo Modesto Milán, detective y entre
otros particulares a preguntas del Fiscal contestó:

"Yo llevé a Fiscalía a este hombre en virtud de que él quería de-
clarar, renunció el derecho que le concede la ley cuyo derecho le fué
advertido por el Fiscal; el Fiscal le dijo que si no quería declarar,
que si declaraba podía utilizarse su declaración en su contra y declaró;
recuerdo que el escribiente del Fiscal escribía la declaración mientras
el acusado declaraba.

"La defensa se opuso a que declarara el testigo porque la declara-
ción del acusado había sido presentada ante el Fiscal bajo juramento
y constaba por escrito y debía ser presentada no siendo admisible la
prueba oral sobre la misma.

"El hon. juez desestimó la objeción y la defensa tomó excepción
y el testigo, con permiso de la corte, declaró lo siguiente ante el
jurado."

De todos los errores alegados en este caso, este es el que
parece mejor establecido. Cuando existe una confesión hecha
por el acusado y escrita o firmada por él y por él aceptada

como ·su verdadera confesión, entonces debe presentarse como prueba el documento mismo y sólo cuando se demuestra que tal documento se ha perdido o extraviado o por alguna otra causa legítima no puede presentarse es que puede admitirse evidencia oral sobre la confesión.

· Véase 12 Cyc., 479, y 6 Am. and Eng. Encyc. of Law, 577.

Pero en el presente caso no se ha demostrado que existiera tal confesión escrita.   El hecho de que el empleado de Fiscalía escribiera mientras el acusado declaraba, no implica que tal escrito se sometiera luego al acusado y que éste lo firmara y aceptara como su propia y verdadera declaración.   El Fiscal pudo ordenar a su empleado que tomara notas escritas de las manifestaciones del acusado hechas ante él y en presencia de testigos bajo juramento, para recordarlas mejor en el momento oportuno.   El acusado debió demostrar que existía una confesión escrita en debida forma y al no hacerlo así, no podemos nosotros ahora considerar bien fundada la excepción y como consecuencia de ello revocar la sentencia apelada y ordenar la celebración de un nuevo juicio, tanto más cuanto que no sólo se presentó prueba oral de la declaración del acusado ante el Fiscal, sino prueba oral de sus admisiones en la misma casa de la víctima y en el cuartel de la policía en San Germán; prueba escrita de su declaración ante el Juez Municipal de San Germán tomada por escrito y por escrito presentada al jurado, conteniendo todas ellas manifestaciones iguales sustancialmente a las contenidas en la declaración prestada ante el Fiscal, y la admisión de su culpabilidad hecha por el acusado en su conversación con el testigo Martí a que nos hemos referido al considerar la primera de las excepciones tomadas por el acusado en este caso.

"Debe mostrarse que el acusado firmó una confesión prestada ante un magistrado, o admitida como correcta, en orden a excluir evidencia oral de la confesión.   (*State* v. *Eaton*, 3 Har., 554 [Del. 1840].)   Evidencia oral de la confesión de un prisionero es admisible a menos que el acusado pueda probar la existencia de una confesión consignada por escrito y fir-

mada por el prisionero. (*State* v. *Johnson,* 5 Har., 507 [Del.
1854].) En un juicio criminal, un testigo de la acusación
puede declarar sobre una confesión hecha por el acusado ante
el juez instructor; a menos que se pruebe que el prisionero
estuvo conforme con su confesión y la firmó cuando se con-
signó por escrito por el juez instructor. (*State* v. *Vicert,* 1
Houst. Cr. Cas., 11 [Del. 1857].)" (14 American Digest,
Century Edition, pár. 1208.)

Las impugnaciones que el apelante consigna en su alegato
con respecto a las instrucciones del juez sobre confesiones
del acusado, carecen de fundamento a nuestro juicio. Tales
instrucciones no fueron excepcionadas en la corte inferior y se
dieron unas a petición de la defensa y otras se sometieron
por la propia defensa al juez y éste las trasmitió al jurado.

Fuera de las excepciones que hemos considerado anterior-
mente, ninguna más aparece tomada por el acusado en este
caso. Las declaraciones de los testigos que oyeron las mani-
festaciones del acusado en la casa de la víctima y en el cuartel
de la policía de San Germán, y la declaración escrita del pro-
pio acusado ante el Juez Municipal de San Germán, se admi-
tieron sin protesta alguna por parte del acusado, y las excep-
ciones tomadas con respecto a la admisión del acusado en su
conversación con el detective Martí y a la declaración del acu-
sado ante el Fiscal, han sido consideradas ya y declaradas
sin fundamento en esta misma opinión. Con respecto a todas
esas manifestaciones, admisiones y declaraciones del acusado,
existe prueba en los autos tendentes a demostrar que fueron
voluntarias y que no se obtuvieron mediante promesas, coac-
ciones o amenazas, y siendo esto así, eran pruebas admisibles
y propias para someterlas a la consideración del jurado.

Esta interesante y delicada cuestión de la confesión del
acusado, ha sido considerada ampliamente por esta Corte Su-
prema en repetidos casos. Citaremos el de *El Pueblo* v. *Ri-
vera,* por asesinato en primer grado, decidido el 25 de junio
de 1904, y el de *El Pueblo* v. *Kent,* decidido el 5 de marzo de

1906, invocando la doctrina legal en ellos establecida como uno de los fundamentos de esta opinión.

En el caso de *El Pueblo v. Martínez et al.*, decidido el 4 de diciembre de 1909, esta Corte Suprema dijo:

"La regla general que impera con respecto a confesiones y a la admisibilidad de las mismas, ha sido claramente formulada por el Juez Freeman en un luminoso comentario que hace con respecto a un caso de Georgia, que se encuentra publicado en la página 242 del Vol. 6, de American States Reports. Encuéntrase ella concebida en las siguientes palabras: 'Una confesión libre y voluntariamente hecha no solamente es admisible como prueba, sino que es la prueba de naturaleza más completa y satisfactoria. Es muy difícil concebir como una persona pueda libre y voluntariamente confesarse culpable de la comisión de un delito sin que sea a ello inducida por los impulsos de la verdad y de la conciencia. Sin embargo, como la historia de la jurisprudencia criminal contiene casos numerosos y perfectamente auténticos de personas acusadas de delitos que se han confesado culpables de crímenes imaginarios e imposibles, y de delitos con respecto a los cuales se ha probado después que nunca han existido, ha venido ello a ser doctrina perfectamente establecida tanto en derecho inglés como en derecho americano que las confesiones de culpabilidad deben recibirse con cautela, especialmente en aquellos casos en que la prueba que de las mismas se aporte sea la de una confesión verbal. Y los tribunales tienen mucho cuidado, antes de admitir una confesión como prueba, de convencerse de que tal confesión no ha sido hecha por influencias de esperanza o de temor o por inducciones de tal naturaleza que influyeran en el ánimo de las personas que las verificaran en el sentido de hacerlas confesar algo incierto. La admisibilidad o inadmisibilidad de una confesión habrá de resolverse determinando si la misma fué obtenida por medios tales que probablemente habrían de inducir al acusado a confesar que había cometido un delito cuando en realidad no hubiera cometido alguno.

(*Commonwealth* v. *Knapp,* 9 *Pick.,* 496; 20 Am. Dec., 491; Joy on Confessions, 51; *Daniels* v. *State,* 6 Am. St. Rep., 242.)''

El apelante alega que la corte se separó de la buena doctrina al trasmitir al jurado la siguiente instrucción:

"La corte instruye al jurado que la declaración prestada por el acusado durante su arresto, no debe aceptarse como cierta en su totalidad, si cree sólo una parte de ella.'' El hon. juez añade: 'eso está de acuerdo con la regla general que el jurado debe examinar las declaraciones de todos los testigos y puede creer aquella parte que el jurado le parezca que deba creerse y rechazar la ótra parte y lo mismo ocurre en cuanto a las confesiones hechas por el acusado durante su arresto.''

No estamos conformes con el apelante. La opinión de la corte es correcta porque "la regla de que una confesión debe considerarse en toda su integridad, no obliga al jurado a dar el mismo crédito a cada parte de ella. El jurado puede creer la parte que estime digna de crédito y rechazar cualquier porción que no le merezca confianza. Toda la confesión debe ser cuidadosamente examinada y, tomando en consideración todas las circunstancias del caso, el jurado debe decidir cual parte de ella acepta y cual rechaza.'' (12 Cyc. 484.)

En cuanto a las instrucciones de la corte sobre la prueba circunstancial, aparece del récord que fueron trasmitidas las mismas que sometió a la corte el abogado defensor del acusado. Las hemos examinado además y no encontramos que se haya cometido por la corte al trasmitirlas error fundamental alguno.

También hemos examinado muy cuidadosamente la ley aplicable a este caso y las pruebas practicadas y hemos llegado a la conclusión de que el veredicto no es contrario a derecho, ni a las pruebas, como alega el apelante.

La muerte ilegal de un sér humano con malicia premeditada, valiéndose de veneno, constituye un delito de asesinato en primer grado previsto en los artículos 199, 200 y 201 del Código Penal y castigado en el 202 del propio Código con la

pena de muerte, o la de reclusión perpetua si existieren cir-
cunstancias atenuantes. Si el acusado se confesare culpable,
el Tribunal determinará la pena.

Y la prueba practicada demuestra más allá de una. duda
razonable la certeza de la muerte de Angel Martell envenena-
do y la intervención voluntaria y deliberada de Juan Flores
Casiano en tal hecho en concepto de autor.

Angel Martell, un hombre como de treinta años de edad,
agricultor, vivía en el barrio de Rosario Peñon, término muni-
cipal de San Germán, distrito judicial de Mayagüez, desde
hacían varios años en concubinato con María del Carmen
Meléndez.

Juan Flores Casiano, un hombre como de treinta y tres
años de edad, se presentó en dicho barrio para el tiempo de
la recogida del café, vivió algunos días en la casa de María
Ramona Justiniano, madre de María del Carmen Meléndez
y luego se fué a vivir a la propia casa de Martell y continuó
habitando en ella en compañía de María del Carmen después
de la muerte de Martell y hasta que fué preso en esta causa.

Martell, que no consta que padeciera de enfermedad algu-
na, murió una noche, allá por el mes de enero de 1910, queján-
dose de un dolor en el estómago. Un pariente y vecino suyo,
el testigo Adolfo Barbosa, fué a su casa y lo encontró "arro-
jando," "quejándose de un dolor," "tumbándose y levántan-
dose" y vió a su lado "a Juan Flores Casiano y a la mujer."
Otro testigo, Juan Ramón Ramos, vecino de Martell, al sen-
tir unos gritos fué a la casa de éste y se encontró con Juan
Flores quien lo invitó a subir y le pidió que le sujetara una
luz mientras él daba, como dió en efecto, a Martell un guarapo
en el cual echó unos polvos que sacó de una caja que tenía en
su bolsillo envuelta en un pañuelo. Y dijo el testigo además
que permaneció en la casa y que Martell murió como una hora
después de haber tomado el guarapo.

El cadáver de Martell fué enterrado sin dificultad alguna
como fallecido a consecuencia de muerte natural, de *angina
de pecho,* según certificó el practicante Cuerda a virtud de los

informes que le diera Juan Flores Casiano, pero la sospecha de que algo extraño había ocurrido surgió y se extendió por el barrio y llegó a conocimiento de la policía y del juez municipal de San Germán, y por orden de dicho juez y con su intervención, el cadáver fué exhumado algunos días después de su enterramiento. Un facultativo practicó la autopsia, extrajo el estómago que fué enviado al laboratorio químico y allí examinado por un perito que declaró bajo juramento ante el jurado que "después de practicar el análisis químico de las vísceras, llegué a la conclusión de que tenían una gran cantidad de arsénico, capaz de producir la muerte a varios individuos."

También la policía desde los primeros momentos practicó gestiones en averiguación de la verdad de lo ocurrido. El detective Juan M. Graciani, se trasladó a la casa de Martell y encontró allí a Flores y a María. Les interrogó sobre la muerte de Martell. Al principio Flores contestó que Martell había fallecido de un dolor estando bueno y sano, y después dijo:

"Que era verdad que él había muerto envenenado, por un veneno que le había echado en el café María del Carmen Meléndez, mujer de Angel Martell y con eso había muerto Angel Martell. Qué esos polvos los había comprado en Mayagüez con cincuenta centavos que ella le había dado en una botica que no sabía seguro, pero que suponía que era la de Saliva."

Las manifestaciones de Flores Casiano fueron oídas además por el testigo Galo Graciani, quien declaró en juicio bajo juramento lo que sigue:

"Conocí a un individuo llamado Angel Martell que murió el día doce de enero envenenado. Yo fuí a acompañar al detective Juan María Graciani a hacer la investigación allí y según las investigaciones, Juan Flores Casiano declaró en mi presencia ante el policía, que había estado en una botica aquí en Mayagüez días antes y había comprado un arsénico, que no sabía lo que era y que no podía precisar la botica donde era y que lo había llevado allí con idea de envenenar a Angel Martell y en un café con leche le habían dado el arsénico."

Juan Flores Casiano fué conducido entonces a San Ger-
mán y por el camino sostuvo una conversación con el detective
Martí quien declaró sobre ella lo siguiente bajo juramento
ante el jurado:

"Al otro día conduje al acusado a San Germán y hablé con él en el
camino: hablamos de los delitos y lo triste que era cometer un delito;
entonces yo le dije a él que sería triste cometer un delito de esa índole;
entonces me dijo: "mejor lo hubiera asesinado a puñaladas antes que
haberlo hecho así por medio de veneno"; al·decir eso no habíamos ha-
blado de ninguna persona, estábamos hablando de los delitos, de lo
que pasaba sobre la conciencia del que cometía un delito y entonces él
hizo esa manifestación."

Cuando Flores Casiano llegó al cuartel de la policía de
San Germán, ocurrió lo que sigue, según declaró bajo jura-
mento ante el Jurado, el Jefe Salomón Costa:

"Ese día llegaron al cuartel de la policía, a las tres o tres y media
de la tarde, el acusado y la señora que le acompañaba, porque los
traía la policía y al llegar allí al cuartel me informaron los policías lo
que había ocurrido y entonces le hice varias preguntas al acusado y él
me manifestó que había sido; esas preguntas que yo le hice no envol-
vían amenazas o coacción alguna y él libre y expóntáneamente mani-
festó que la señora María del Carmen, él vivía en la casa de la señora
esa, y del interfecto; que esa señora le había invitado o mejor dicho,
que él le había dicho a ella que quería buscar una cosa para embobar
a Angel Martell, entonces vino a Mayagüez, compró una cajita de
veneno en una botica cerca de la iglesia, no sabe decir en qué botica
era; que regresó al barrio del Peñón; hicieron allí un café con leche
y se lo llevaron al trabajo donde él estaba trabajando, llegaron allí, se
lo dieron y al cabo del rato regresó el señor ese con un dolor, vino a
la casa y entonces él salió al poblado del Rosario donde el practicante
a buscar un medicamento; él me dijo que había llevado el medicamento
y que empezaron a dárselo por cucharadas y que al cabo del rato
murió; él me dijo que le había dado un medicamento que le había dado
el practicante y que dándole las cucharadas del medicamento murió."

A preguntas de la defensa, contestó:

"Yo dije que el acusado me dijo que vino a Mayagüez, a comprar,
no un veneno, sino una cosa para embobarlo; yo dije que el acusado me

dijo que junto con esa otra señora fueron al trabajo donde estaba Martell; el acusado me dijo que la señora era la que llevaba la botella, pero él acompañaba a la señora a llevar la botella que ya contenía el veneno; esas declaraciones fueron hechas por el acusado tranquilamente, hechas por él mismo y después vino la señora, la llamé y lo mismo me manifestó la señora; sin esperar nada de mí, sin coacción, el mismo acusado puede decir si ha habido coacción; el acusado estaba bajo arresto; no hizo absolutamente resistencia; no sé decirle si hizo resistencia, pero la policía no me manifestó nada que hiciere resistencia y llegaron allí los acusados y enseguida·estuvimos hablando y después dije 'llévelos a la corte municipal,' y enseguida declaró eso.''

Llevado Juan Flores Casiano a la presencia del Juez Municipal, John J. Siebert, que instruía las primeras diligencias, prestó una declaración en forma que fué tomada por escrito y presentada al jurado. El juez declaró como testigo ante el jurado y dijo:

"Soy juez municipal de San Germán; conozco al acusado; lo he visto antes de ahora en la corte municipal de San Germán, cuando fué traído por la policía y declaró en la corte. En la corte hice presente al acusado el derecho que tenía de declarar o de no declarar y él voluntariamente manifestó que él deseaba declarar y declaró. Esa declaración la hizo expóntanea y libremente, previa la advertencia que le hice. Esta es la declaración prestada por Juan Flores Casiano. El testigo por orden de la corte·a petición de la defensa dió lectura a la declaración que es como sigue:

" 'Yo, Juan Flores Casiano, vecino de San Germán, en Rosario Peñón, soltero, jornalero, de 33 años, declaro: que el juez municipal de San Germán me ha instruído de la acusación en la causa sobre muerte ilegal de Angel Martell y del derecho que tengo para abstenerme de declarar, pero deseando hacerlo, hago constar que lo ocurrido es lo siguiente: Que en octubre del año pasado, entablé amores con María del Carmen Meléndez, querida de Angel Martell, quien en aquella fecha me propuso la sacara de la casa y me la llevara a vivir conmigo; que no acepté y hará un mes por indicaciones de ella y de Angel Martell me·fuí a vivir a la casa de ellos; que María del Carmen luego ·de vivir en la casa, me propuso primeramente que buscara un hechizo para embobar a Angel Martell y luego me propuso también que buscara *rough-on-rats* para matarlo, pero ni una cosa ni otra acepté; que el lunes de la semana pasada fuí a Mayagüez a comprar

un lienzo para pantalones y María me dió cuatro reales para que le comprara una cajita de *rough-on-rats,* diciéndome que era para los ratones y para matar un comején que había en la casa; que el mismo lunes regresé trayéndole la cajita con los polvos interesados, la cual compré en una botica, cuyo nombre no recuerdo, pero queda cerca de la iglesia; que entregué la cajita a María del Carmen y el miércoles, doce de este mes, entre claro y oscuro, me fuí a trabajar a la finca de Doña Duba, cuyo apellido no sé, quedando Angel en la casa; pero poco rato después—esto es, media hora más tarde—lo ví pasar para su trabajo a otra finca distinta; que no ví en toda la mañana a María del Carmen, hasta las diez más o menos en que desde larga distancia me llamó, viendo entonces que estaba con Angel; que al acercarse a ellos éste se sentía malo con dolores de vientre y vómitos y lo ayudé a llevar a su casa y más tarde fuí donde el practicante Don Rafael Cuerda a quien expliqué lo que tenía Angel y habiéndome dado una poción, yo mismo se la apliqué por cucharadas, muriendo como a la una o dos de la madrugada del siguiente día; que el jueves trece fuí al Rosario, dí cuenta de la muerte al Sr. Cuerda y a Don Galo Graciani, encargado del registro civil y traje el ataud para enterrarlo; que no es cierto que yo propusiera a María del Carmen dar muerte a Angel Martell; que comprara el *rough-on-rats* y lo aplicara en el café que tenía que llevarle al querido; que tampoco es cierto que amenazara a María con matarla si no aplicaba el veneno y que me quedara vigilándola cuando le llevaba el almuerzo a Angel, para que le diera el café envenenado; que no es verdad asimismo que la poción que me dió Cuerda no la llevé a la casa y que la sustituyera por una cuarta de ron y anís que comprara a José Rodríguez y aplicar esta bebida por gotas a Angel Martell; que no es verdad que en un guarapo de hojas de tártago aplicara nuevamente veneno a Martell y que no sé donde está la cajita conteniendo los polvos venenosos. Juan Flores, su marca. Jurada y signada ante mí en San Germán a 20 de enero de 1910. John J. Siebert, Juez Municipal.''

La defensa no repreguntó.

Y conducido por último Juan Flores Casiano a la presencia del Fiscal, después de haberle advertido este funcionario que si declaraba su declaración podía utilizarse en su contra, Juan Flores Casiano volvió a hacer manifestaciones sustancialmente iguales a las consignadas en su declaración ante el juez municipal, según expresó bajo juramento el detective Milán.

Para corroborar la declaración de Flores Casiano, el detective Milán lo condujo a la botica de Saliva y allí lo reconoció el dependiente Manuel Marín, quien declaró lo que sigue bajo juramento ante el jurado.

"Conozco al acusado que estuvo allí creo que en enero, una mañana en busca de una caja de *rough-on-rats* y el día antes había comprado un poco de cebadilla y al otro día no estaba el dependiente que le había vendido; él tenía catorce centavos y el poco de cebadilla que valía cinco, eran diez y nueve y decía que quedaba a deber un centavo y que le vendiera una caja de *rough-on-rats* y yo se la vendí; él me dijo al entrar que no necesitaba aquella cebadilla que se le había vendido, que él lo que quería era *rough-on-rats*, porque era un veneno lo que él quería y le pregunté para qué lo quería y me dijo que era para ratones; entonces yo le dije que tuviera cuidado, que tomara precauciones para usarlo, porque era un veneno muy activo, le advertí que aquello podía producir la muerte de una persona, porque cuando él me dijo que quería un veneno más activo, me supuse que él creía que no era muy fuerte y entonces le dije que tuviera cuidado, que tomara precauciones, al ponerlo, por un niño o algo así. *Rough-on-rats* es una sal arsenical, en una cajita de esas caben dos onzas, que vienen a ser cincuenta y ocho gramos próximamente; el *rough-on-rats* es más venenoso que la cebadilla, con un gramo hay suficiente para matar a cualquiera, se puede tomar hasta diez centígramos en un día y con veinte centígramos se puede matar a cualquiera."

A repreguntas de la defensa, contestó:

"Yo no puedo precisar ahora el día en que Juan Flores estuvo allí; sé que fué en enero; que pocos días después estuvo el policía Milán con el señor, a principios de enero; no puedo precisar el día, pero fué en los primeros días de enero."

El practicante Cuerda declaró bajo juramento ante el jurado que él expidió la certificación de la muerte de Martell como fallecido a consecuencia de "angina de pecho" a virtud de las manifestaciones que le hiciera Juan Flores Casiano; que practicó luego un registro de los alrededores de la casa

de Martell y encontró enterradas ropas de Martell y una gallina muerta al parecer envenenada, y dijo además:

"Yo no tenía conocimiento de que Angel Martell estuviera enfermo. Conozco a Juan Flores Casiano; le he visto dos o tres veces en el pueblo; es el acusado. El día anterior a esa madrugada no ví a Juan Flores; no estuvo por mi casa; no tuve conocimiento de que Angel Martell estuviera enfermo, porque era un barrio muy distante del pueblo; no recuerdo haber despachado ninguna medicina para Martell; yo ví a este hombre en el pueblo tres o cuatro veces y un día estuvo en casa con un hermano, mucho tiempo antes, pero el día que murió Martell ni el día antes ví a este acusado por mí casa."

Y el testigo José Rodríguez declaró también bajo juramento ante el jurado que el día antes de la muerte de Martell había despachado un ron y un anís a Juan Flores Casiano.

Tales fueron en resumen las pruebas practicadas en este caso. La muerte de Martell quedó plenamente demostrada por prueba directa y la culpabilidad del acusado Juan Flores Casiano como autor de la muerte de Martell en la forma que se le imputa en el acta de acusación, quedó también plenamente demostrada a virtud de todas las pruebas practicadas examinadas en conjunto.

El crimen perpetrado por Juan Flores Casiano es de los más graves y siniestros que pueden imaginarse y la terrible pena que se le impuso es el justo castigo que la ley señala para delitos de tal naturaleza.

El recurso debe declararse sin lugar y confirmarse la sentencia apelada.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Hernández, y Asociados, MacLeary y Wolf.

El Juez Asociado, Sr. Aldrey, no intervino en la resolución de este caso.