EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
CARLOS ARROCHO, acusado y apelante.

No. 2615.—*Visto:* Enero 14, 1926. *Resuelto:* Enero 18, 1926.

1. DERECHO PENAL—FECHA DEL JUICIO Y SUSPENSIÓN—COACUSADOS—ENFERMEDAD
DEL ABOGADO DE UNOS DE LOS ACUSADOS.—Cuando dos reos son acusados jun-
tos y tienen abogados distintos y por enfermedad de uno de éstos se pide
la suspensión del juicio, no abusa de la discreción que le otorga el artículo
238 del Código de Enjuiciamiento Criminal el tribunal que ordene que con-
tinúe, por separado, la celebración del juicio en cuanto al acusado que tiene
su abogado presente.

2. DERECHO PENAL—EVIDENCIA—CONFESIONES—SU EFECTO EN EL JURADO.—La
regla de que una confesión debe considerarse en toda su integridad no obliga
al jurado a dar el mismo crédito a cada parte de ella, pues éste puede creer
la parte que estime digna de crédito y rechazar cualquier porción que no le
merezca confianza (*Pueblo* v. *Flores*, 17: 178, confirmado).

3. DERECHO PENAL— JUICIO— VEREDICTO— EXPRESIÓN DE CIRCUNSTANCIAS ATE-
NUANTES EN EL MISMO—EN GENERAL.—Un jurado no está obligado a con-
signar en su veredicto que existen circunstancias atenuantes a menos que las
pruebas demuestren su existencia y la ley las reconozca como tales.

4. ESTATUTOS—MATERIAS Y TÍTULOS DE LAS LEYES—SU VALIDEZ—LEYES AFECTA-
DAS POR LOS TÍTULOS.—Siendo la sección 6 de la Ley 36 de 1917 (1917 (2),
p. 325) afín al asunto principal expresado en el título y necesaria para lle-
var a cabo el propósito de la ley, es válida aunque no conste expresamente
en el título.

5. ESTATUTOS—DEROGACIÓN, SUSPENSIÓN, EXPIRACIÓN DEL TÉRMINO Y RESTABLE-
CIMIENTO (*Revival*)— SUSPENSIÓN TEMPORAL DE LEYES — SU EFECTO. —Ha-
biendo sido la intención de la Legislatura al aprobar la Ley 36 de 1917
(1917 (2), p. 325) suspender temporalmente la pena de muerte, la enmienda
del artículo 202 del Código Penal hecha para cumplir el propósito de la ley
no es de tal naturaleza que exija que dicho artículo sea decretado nuevamente
y publicado en totalidad para que entre a regir de nuevo al fenecer el plazo
de la suspensión temporal fijado por la misma ley.

SENTENCIA de *M. Rodríguez Serra,* J. (Segundo Distrito, San Juan),
condenando al acusado a la pena capital por delito de asesinato
en primer grado. *Confirmada.*

*Luis Muñoz Morales,* abogado del apelante; *José E. Figueras,* abo-
gado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del
tribunal.

Condenado a muerte Carlos Arrocho, apeló para ante este
tribunal. En su alegato su abogado señala tres errores co-
metidos a su juicio por la corte de distrito, 1, al negar la
suspensión de la vista y ordenar la separación de los juicios,

sin la expresa petición del acusado; 2, al declarar sin lugar la *moción* de nuevo juicio, y 3, al resolver en su contra la moción de suspensión de la sentencia que tuvo por fundamento la no vigencia de la pena de muerte en Puerto Rico.

[1] Examinemos el primer error. Los autos demuestran en relación con el mismo que el 9 de diciembre de 1924 se llamó la causa para la vista compareciendo El Pueblo por su Fiscal y el acusado Arrocho en persona y por su abogado. Acto seguido el abogado de Arrocho presentó una moción por escrito solicitando la suspensión del juicio por encontrarse enfermo el abogado del otro acusado Clemente. La acusación imputa el delito de asesinato a dos personas, Jacinto Clemente y Carlos Arrocho.

El Fiscal, alegando que ambos acusados tenían abogados distintos, no se opuso a la suspensión en cuanto al acusado Clemente pero insistió en que se celebrara en cuanto al acusado Arrocho. Entonces la corte, dirigiéndose al abogado de Arrocho, le preguntó: "¿Hay alguna circunstancia que le impida entrar en juicio a Carlos Arrocho?" Y el abogado contestó: "En representación del compañero Tizol, insistiría en la suspensión de los dos casos; pero en el caso que la corte crea que no, yo estoy a disposición de la corte, tomando excepción en nombre del licenciado Tizol, de la resolución de su señoría."

La resolución de la corte fué como sigue:

"La corte va a acceder a la moción de suspensión del juicio en cuanto al juicio contra Jacinto Clemente. En vista de que este caso puede ser juzgado separado o conjuntamente, y ya en el anterior juicio lo fueron separadamente, la corte cree que aun cuando puede suspenderse para otra fecha la celebración del juicio contra Jacinto Clemente, no hay razón alguna para que en el día de hoy, presentes los jurados y la prueba del Fiscal y estando el acusado presente, deje de celebrarse el caso contra Carlos Arrocho; por tanto, se ordena la constitución del jurado y la celebración del juicio contra Carlos Arrocho. Se deniega la moción de suspensión de los dos juicios; se ordena la separación de los mismos, y la celebración del juicio de Carlos Arrocho."

Y la excepción tomada así:

"En representación del compañero Tizol, y de acuerdo con el artículo 238, tomo excepción de la resolución de la corte. Ahora, como abogado defensor de Carlos Arrocho, estoy a disposición de la corte."

Basta la simple lectura de lo ocurrido y la del artículo 238 del Código de Enjuiciamiento Criminal que dice: "Cuando dos o más reos hayan sido acusados juntos de haber cometido un delito grave ('felony'), cualquiera de ellos que así lo exija, podrá ser juzgado separadamente. En los demás casos, los reos podrán ser juzgados separadamente o juntos, a arbitrio del tribunal," para concluir que no se ha cometido el primero de los errores señalados. La corte tenía discreción y nada demuestra que ejercitara su poder en perjuicio del acusado.

[2, 3] Para considerar el segundo error, es necesario penetrar en los méritos del caso.

Se imputó a Arrocho el hecho de haber, en unión de otro acusado, el día 20 de febrero de 1924 y en la municipalidad de Río Piedras, dado muerte con malicia premeditada a la niña menor de catorce años Guillermina Rodríguez, con motivo de cometer con ella el delito de violación.

Hemos examinado la prueba y surge clara, evidente, la culpabilidad del acusado. La niña salió de su casa para la escuela el 20 de febrero y no volvió. Se le buscó sin descanso y al día siguiente fué encontrado su cadáver en un cañaveral, con un lazo al cuello fuertemente atado. Practicada la autopsia, el facultativo declaró que la muerte se debió a extrangulación por asfixia. El examen del cuerpecito de la niña demostró también que había sido violada.

La muerte violenta quedó establecida. ¿Quién fué el autor? Varios testigos vieron al acusado cerca de la niña cuando caminaba de su casa hacia la escuela. La casa está en el campo y ella iba por el camino llamado de Cepero. Un testigo presenció cuando el acusado y otra persona se apo-

deraron de la niña y la internaron en el cañaveral donde
se encontró su cadáver. El propio acusado declaró ante el
Fiscal que por miedo a Clemente, el otro acusado, le ayudó
a internar la niña y por miedo también yació con ella, pero
dice que se separó cuando la niña estaba aún viva en com-
pañía de Clemente. Y el testigo Arturo Rodríguez declaró
que se encontraba preso en las galeras del presidio y trabó
amistad con Arrocho y Clemente quienes le preguntaron
que por qué estaba allí. Contestó. Siguió la conversación
y, copiando sus propias palabras, "me dijeron a mí que
ellos estaban velando la niña en una curva que hay en un
camino que le dicen Cepero y cuando pasaba la niña le echa-
ron mano y cuando ella fué a gritar le quitaron un cinturón
que llevaba en el vestido y se lo ataron del cuello, y se lo
apretaron; entonces la pasaron al otro lado y que ella les
decía no me maten, que yo me caso con uno de ustedes."
Entonces le dijeron 'no, porque nos descubre, nosotros te
vamos a gozar y por la noche enterrarla' que pensaban en-
terrarla por la noche." Las manifestaciones "me las ha-
cía Carlos Arrocho y Jacinto Clemente. . . . . El primero
que habló fué Carlos Arrocho . . . . después de hablar le
pregunté a Jacinto Clemente si había sido verdad y me
dijo que sí, que entre los dos la habían cogido y la habían
gozado cada uno dos veces." Le dijeron que no la habían
enterrado "porque no les dió tiempo, porque estaban en
busca de ellos, había mucho movimiento."

Ese es, a grandes rasgos, el resultado de la prueba.
Sostiene el apelante que no es suficiente para castigarlo por
asesinato.

(*a*) Alega en primer término, que el jurado no pudo
admitir una parte de su confesión y desechar otra, invo-
cando el caso de *El Pueblo* v. *Flores,* 17 D.P.R. 178.

El caso de Flores es adverso al acusado. En él, citando
12 Cyc 484, se dijo: "la regla de que una confesión debe
considerarse en toda su integridad, no obliga al jurado a
dar el mismo crédito a cada parte de ella. El jurado puede

creer la parte que estime digna de crédito y rechazar cualquier porción que no le merezca confianza. Toda la confesión debe ser cuidadosamente examinada y, tomando en consideración todas las circunstancias del caso, el jurado debe decidir cuál parte de ella acepta y cuál rechaza.''

Aquí la confesión del acusado hecha al declarar ante el Fiscal, se sometió íntegra, tal como se hizo al jurado. También se sometieron al jurado las admisiones del acusado hechas en su conversación con el testigo Rodríguez, por medio de la declaración de Rodríguez. Y el jurado seguramente completó la primera con las segundas y enlazando ambas con el resto de la prueba quedó convencido de la culpabilidad del acusado y así lo expresó en su veredicto.

Pretender que el jurado esté obligado a aceptar que los hechos ocurrieron en la exacta forma expresada en la confesión, sería dejar al arbitrio del acusado el establecimiento de la verdad, y así aceptando la responsabilidad de una muerte, por ejemplo, podría convertirla de asesinato en homicidio. El jurado examina, juzga, pesa y aquilata toda la prueba. La confesión en este caso fué parte de la prueba y el jurado la apreció a la luz y en relación con el resto de la misma, y al actuar así no cometió error alguno.

Insiste el apelante en que, en todo caso, de la prueba resultan dos circunstancias atenuantes que dejaron de ser apreciadas por el jurado, a saber: la edad del acusado y su retardo mental.

Al instruir el juez al jurado, se expresó, en parte, así:

''Vuestro veredicto puede ser en ese sentido de dos maneras. Simplemente de culpable del delito de asesinato en primer grado, o si vosotros creeis, según os dije antes, lo que él dijo en su declaración al Fiscal, que hubo alguna circunstancia que atenuara su responsabilidad, su culpabilidad en la realización del hecho, si creeis eso, entonces podríais estampar en el veredicto de culpabilidad, la frase 'con circunstancias atenuantes.' Si vosotros creeis que no hubo tales circunstancias atenuantes, omitiréis esa frase, y lo declararéis culpable del delito de asesinato en primer grado. Si vosotros creeis que no es responsable del delito, que lo que han dicho esos

testigos no es verdad, que este hombre no estuvo por allí, ni tuvo
participación alguna en los hechos que se le imputan, que es ino-
cente o tenéis dudas razonables de su culpabilidad, entonces vuestro
deber es traer un veredicto de inocente o no culpable.''

El jurado rindió un veredicto de culpable de asesinato
en primer grado. No apreció circunstancia atenuante al-
guna y nada demuestra en los autos que tuviera el deber de
apreciarla.

(b) En relación con la edad, nuestra vigente ley penal
se refiere a ella únicamente para establecer la incapacidad
de delinquir. Hasta los siete años se considera a un niño
incapaz para cometer conscientemente un crimen y desde
los siete hasta los catorce también se le considera incapaz
a menos que exista prueba plena de que al ·cometer el acto
de que se le acusa, tenía conciencia de su maldad. Art. 39
del Código Penal.

Nuestra antigua ley penal,—el Código de 1879—, no sólo
fijaba las circunstancias eximientes si que también las ate-
nuantes, y se consideraba atenuante la de ser el culpable
menor de diez y ocho años. Art. 9 del Código Penal de
1879.

Arrocho había cumplido diez y nueve años de edad cuando
perpetró el delito. Nada obligaba al jurado a considerar
que no tenía la edad suficiente para exigirle la plena ·res-
ponsabilidad de· sus actos.

(c) Para demostrar el llamado retardo mental del acu-
sado, se presentó la declaración de Gaspar Encarnación, pro-
fesor de instrucción primaria que ejercía en el presidio en
que estaba recluído el acusado.

Dijo que conocía desde hacía cuatro meses a Arrocho,.
que cuando comenzó a enseñarlo se encontraba en ''un grado·
de instrucción rudimentario,'' que siguió ''los estudios que·
se siguen en el grado primario,'' y que ''ha pasado del grado·
primario.'' Y luego aseguró que Arrocho ''tiene lo que po-
dríamos llamar la afacia sensorial y consiste en que él pa-
dece una sordera mental, que aun cuando el individuo sea.

un adulto o un hombre, puede oir cualquier manifestación, y esa manifestación ni la entiende perfectamente, no la puede interpretar, no la puede entender; se encuentra en un estado de un niño de un año de edad, que puede oir cualquier cosa que se converse en su presencia y no entiende lo que se dice.''

La verdad es que los hechos establecidos por el mismo profesor, no parecen justificar su conclusión. Arrocho tenía un estado de educación rudimentario, que según el mismo profesor declaró, es ''una enseñanza que se da más o menos en primer grado, ligeramente.'' Miles de hombres en esta Isla por desgracia no tienen ni ese estado. Arrocho al recibir las enseñanzas del profesor durante cuatro meses, ''pasó de grado.'' Su mente no parece, pues, tan retardada. La conclusión del profesor es en sí misma tan exagerada, que se comprende que no hiciera impresión favorable alguna en el jurado.

[4, 5] ¿Existe la pena de muerte en Puerto Rico? El apelante sostiene que no. Estudiemos el caso.

El artículo 202 del Código Penal vigente en esta Isla, dice, en lo pertinente:

''Art. 202.—Toda persona culpable de asesinato en primer grado incurrirá en pena de muerte, ó si hubiere circunstancias atenuantes se le impondrá la pena de reclusión perpetua. . . .''

En 1917 se aprobó la Ley No. 36, cuyos títulos y secciones 1, 2, 4, 5, 6 y 7, expresan:

''Ley para abolir temporalmente la pena de muerte en Puerto Rico; enmendar los artículos 202 y 219 del Código Penal, el 327 del Código de Enjuiciamiento Criminal y derogar los 331 al 334, ambos inclusive, de este cuerpo legal; para la formación de estadísticas especiales, y para otros fines.

''Sección 1.—La pena de muerte es abolida en Puerto Rico durante el tiempo señalado en la Sección 6 de la presente Ley.

''Sección 2.—El artículo 202 del Código Penal queda enmendado de la manera siguiente:

" 'Artículo 202.—Toda persona culpable de asesinato en primer grado será castigada con reclusión perpetua en el presidio, y toda persona culpable de asesinato en segundo grado será castigada con prisión en el presidio por no menos de diez años, ni más de treinta años. Toda persona castigada con reclusión perpetua permanecerá constantemente en el penal.'

"Sección 4.—El artículo 327 del Código de Enjuiciamiento Criminal queda enmendado del modo siguiente:

" 'Artículo 327.—Cuando se haya dictado sentencia se entregará inmediatamente una copia certificada del original al oficial que tenga la obligación de ejecutarla, y no será necesaria ninguna otra orden ni autorización para justificar o pedir la ejecución.'

"Sección 5.—Los artículos 331 a 334, ambos inclusive, del Código de Enjuiciamiento Criminal y el inciso 6º del artículo 227 del mismo Código, y cualquiera otra ley que se oponga a la presente quedan derogados.

"Sección 6.—Esta Ley regirá noventa días después de su aprobación y estará en vigor hasta el 30 de abril de 1921 y, si para tal fecha la Asamblea Legislativa no hubiere resuelto otra cosa, esta Ley quedará derogada, y los artículos enmendados por ella vigentes en su forma anterior.

"La presente Ley tendrá efecto retroactivo aplicable a los reos condenados a muerte y cuya pena no hubiere sido ejecutada.

"Sección 7.—A partir de la fecha de la aprobación de esta Ley, el Departamento de Justicia hará practicar estadísticas especiales de los delitos de asesinato, homicidio, atentado contra la vida y ataque con intención de homicidio, debiendo dichas estadísticas comprender los elementos esenciales para determinar el curso de la criminalidad en tales delitos, y ser enviadas por el Departamento de Justicia a la Asamblea Legislativa en cada período, al comenzar sus sesiones ordinarias.''

No obstante haber pasado el 30 de abril de 1921 sin que llegara a aprobarse ley alguna sobre el particular, alega el apelante que la abolición de la pena de muerte subsiste porque la ley era nula en aquella parte,—sección 6—, de la misma no expresada en el título y por que no fué restablecido el artículo 202 del Código Penal en debida forma.

(*a*) Para basar su alegación en cuanto al primer punto

invoca el apelante el párrafo de la sección 34 de nuestra Acta Orgánica que dice:

"No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en el título; pero si algún asunto que no esté expresado en el título fuere incluído en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en el título."

No estamos conformes. La ley claramente expresa en su título que es para abolir *temporalmente* la pena de muerte y es la sección sexta la que fija el período. Se trata del mismo asunto. En todo caso de asuntos germanos.

Resumiendo la jurisprudencia sobre la materia, dice Ruling Case Law:

"Una ley no es anticonstitucional porque contenga más de una materia cuando las distintas materias son afines al asunto principal, o se relacionan directa o indirectamente con el asunto principal, y tienen una relación mutua con el asunto de la ley, sin ser extrañas a la misma, o cuando las disposiciones de la ley son de igual naturaleza y legítimamente caen bajo el mismo tópico." 25 R.C.L. 844.

"Puesto que un estatuto puede comprender todas las materias afines al asunto principal, puede incluir todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general. Una ley puede contener muchas disposiciones y detalles para llevar a cabo el fin legislativo, y si los mismos tienden de una manera legítima a efectuar ese fin la ley no es contraria a la disposición constitucional." *Id.* 846.

"Las disposiciones constitucionales quedan cumplidas si el título expresa en términos generales el asunto, o, bajo algunas disposiciones, el objeto de la ley, y no es necesario que mencione los detalles de la legislación, ni contenga un extracto, sinopsis o índice del contenido de la ley, pues las disposiciones constitucionales no pueden ser tan estrechamente interpretadas que exijan que el título de una ley contenga en sí mismo toda la ley. Esto haría la legislación muy difícil y la pondría en constante peligro de ser declarada nula." *Id.* 855-6.

(*b*) Y en apoyo de su contención sobre el no restableci-

miento del artículo 202 del. Código. Penal, cita el apelante
otro párrafo de la dicha sección 34 de nuestra Acta Orgá-
nica, que expresa:

"Ninguna ley será restablecida o enmendada, ni se dará mayor
alcance a sus disposiciones, ni se conferirán las facultades en ella
contenidas, haciendo referencia a su título solamente, sino que toda
la parte de ella que sea restablecida, enmendada, extendida o con-
ferida será decretada nuevamente y publicada en su totalidad."

Tampoco estamos conformes. No se trata aquí de res-
tablecer una ley enmendada o derogada. La ley No. 36 con-
tiene en sí misma todo lo que es necesario. Suspende tem-
poralmente, como un experimento, la pena de muerte, y en-
mienda, como era natural, también temporalmente, el ar-
tículo del Código que impone dicha pena. La enmienda se
hace condicionalmente y por un tiempo fijo transcurrido el
cual queda automáticamente en pie el precepto como si ja-
más hubiera sido enmendado.

En uno de los primeros casos decididos por la Corte Su-
prema de los Estados Unidos en el cual el Chief Justice
Ellsworth escribió la opinión, se dijo:

"La suspensión de una ley por tiempo limitado no cónstituye
una derogación de la misma. * * * El fin manifiesto de la ley
que se suspendió era que la ley derogada por la ley derogatoria con-
tinuara en vigor hasta una fecha entonces futura, o sea, el 1º de oc-
tubre de 1793. No podía haber tenido otro fin. Y la intención de
la legislatura, después que se descubre, debe prevalecer, sin que im-
porte regla alguna contraria de interpretación contenida en leyes
anteriores." *Brown* v. *Barry,* 3 U.S. 367, (1 L. Ed. 638).

Y que se trata de una mera suspensión y no de una en-
mienda definitiva que requiera el restablecimiento del pre-
cepto en la forma ordenada por la Ley Orgánica, lo ha ex-
presado con su actitud de modo inequívoco la propia Asam-
blea Legislativa.

En 1921 la Asamblea pasó el proyecto de ley No. 9 del
Senado aboliendo definitivamente la pena de muerte. Fué
remitido al Gobernador y no habiendo sido firmado por él

dentro de los treinta días siguientes, no quedó convertido en ley.

Volvió la Asamblea en 1923 a pasar otro proyecto aboliendo definitivamente la pena de muerte en Puerto Rico y enviado que fué al Gobernador, este funcionario, en julio 21, lo devolvió sin su aprobación, así:

"SAN JUAN, P. R., <em>julio 21, 1923.</em>

"PRESIDENTE DEL SENADO,

"San Juan, P. R.

"SEÑOR:

"Tengo el honor de devolver adjunto, sin aprobar, el proyecto del Senado No. 26, titulado:

> " 'LEY para abolir la pena de muerte en Puerto Rico; enmendar los artículos 202 y 219 del Código Penal, artículo 327 del Código de Enjuiciamiento Criminal, y para derogar los artículos 331 a 334, ambos inclusive, de este cuerpo legal.'

por las siguientes razones:

"Este proyecto que concierne quizá al más importante y grande cambio afectante a las leyes penales de Puerto Rico que pueda presentarse para consideración, necesita la más cuidadosa investigación y consideración de mi parte, antes de que yo pueda sentirme justificado en dar mi aprobación.

"Durante el largo período de dominación española y durante cerca de veinticinco años de administración americana, la presente ley ha permanecido en vigor, con la sola excepción de su suspensión temporal desde noviembre, 1917, hasta abril, 1921, según se proveyó por la Ley No. 36, Leyes de 1917. Una aprobación a cambio tan drástico en la ley vigente con una ligera oportunidad para considerarlo, difícilmente estaría justificada.

"Respetuosamente,

"H. M. TOWNER, <em>Gobernador.</em>"

Por último, en 1925, se presentó en el Senado otro proyecto de ley, el No. 14, para abolir la pena de muerte. El Senado lo aprobó, pero la Cámara nada resolvió en definitiva.

(c) En cuanto a la derogación de los artículos 331 al 334 del Código de Enjuiciamiento Criminal no mencionados

en la sección sexta de la ley No. 36 de 1917, bien puede admitirse que derogados permanecen sin que ello influya en la resolución de la cuestión principal envuelta. Los artículos 342 y 343 del propio Código que establecen cómo y dónde se ejecutarán las sentencias de muerte, y otros preceptos que contienen todo lo que es absolutamente necesario, nunca fueron alterados.

*Por virtud de todo lo expuesto, debe confirmarse la sentencia recurrida.*