## EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PASCUAL RAMOS, acusado y apelante.

No. 2933.—*Visto:* Marzo 23, 1927. *Resuelto:* Mayo 25, 1927.

1. DERECHO CONSTITUCIONAL—IGUAL PROTECCIÓN DE LAS LEYES—PROCESOS POR DELITOS U OFENSAS.—La Ley No. 98 de 1925 (p. 789), en cuanto establece un modo de enjuiciar diferente para los delitos cometidos por funcionarios públicos y los perpetrados por ciudadanos privados, no constituye una legislación de clases ni está en pugna con nuestra Carta Orgánica, artículo 2, y la Constitución Federal.

2. DERECHO PENAL—EVIDENCIA—HECHOS EN CONTROVERSIA *(Issue)* Y PERTINENTES A LAS CUESTIONES LITIGIOSAS, Y *Res Gestae*—MANIFESTACIONES DEL O LOS ACUSADOS—MANIFESTACIONES HECHAS CUANDO YA SE HA TENIDO TIEMPO DE REFLEXIONAR SOBRE EL SUCESO.—Las manifestaciones de un acusado hechas horas después del suceso, cuando ya ha tenido tiempo de reflexionar sobre el mismo, y en sitio y ocasión distintos, no son admisibles en evidencia como parte de la *res gestae*.

3. DERECHO PENAL—MOCIONES DE NUEVO JUICIO Y EN ARRESTO DE SENTENCIA—FUNDAMENTO DE LA MOCIÓN EN ARRESTO DE SENTENCIA—INEXISTENCIA DE LA PENA DE MUERTE.—De acuerdo con la ley y la jurisprudencia, existe la pena de muerte en Puerto Rico, por lo que, una corte, propiamente declara sin lugar moción que, en arresto de la sentencia, se base en que dicha pena no existe.

4. JURADO—SORTEO O FORMACIÓN DEL JURADO QUE HA DE CONOCER DEL JUICIO Y JURAMENTO—OBJECIÓN A LA FORMACIÓN DEL JURADO—OBJECIÓN NO MERITORIA.—Una objeción a la formación del jurado presentada después de celebrado el juicio y de aceptados expresamente por las partes los caballeros del jurado que intervinieron en la causa, carece generalmente de mérito alguno.

5. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—PRESENTACIÓN Y RESERVA EN LA CORTE INFERIOR DE LOS FUNDAMENTOS DE REVISIÓN—NECESIDAD DE QUE LAS CUESTIONES SE PRESENTEN EN LA CORTE INFERIOR.—Para que una parte pueda atacar en apelación la declaración de un testigo como inadmisible, es necesario que la haya objetado y excepcionado en la corte inferior.

6. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—REVISIÓN—ERRORES NO PERJUDICIALES—ADMISIÓN DE PRUEBA OBJETADA—PRUEBA SOBRE HECHOS ESTABLECIDOS POR OTRA PRUEBA.—La admisión de la declaración de un médico respecto a la posición relativa de las partes en los momentos del ataque no es perjudicial cuando otros testigos colocan a las partes en la misma posición.

7. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—PRESENTACIÓN Y RESERVA EN LA CORTE INFERIOR DE LOS FUNDAMENTOS DE REVISIÓN—NECESIDAD DE QUE LAS OBJECIONES SE PRESENTEN EN LA CORTE INFERIOR—EVIDENCIA—EN GENERAL.—Una apelante no puede quejarse de que se permitiera a un testigo declarar en determinada forma cuando la declaración, además de ser permisible, contra ella no se ha tomado la debida excepción en la corte inferior.

8. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—REVISIÓN—CUESTIONES DISCRECIONALES—CONCESIÓN O NEGATIVA DE NUEVO JUICIO—PRUEBA NUEVAMENTE DESCUBIERTA.—Examinada la prueba como nuevamente descubierta, a los efectos de solicitar un nuevo juicio, *se resolvió:* que ella no se refería

a cómo ocurrió el hecho sino a los motivos y que era, más que favorable, adversa al acusado, y por lo tanto no erró la corte al negar la solicitud.

9. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—REVISIÓN—VEREDICTOS—FINALIDAD DE LOS MISMOS—VEREDICTO SOBRE PRUEBA CONTRADICTORIA.—Cuando el jurado resuelve el conflicto en las pruebas y nada existe que demuestre que no actuara de acuerdo con la ley y la justicia, y un examen de la prueba demuestra que actuó derechamente, no puede concluirse que el veredicto es contrario a las pruebas.

10. DERECHO PENAL—JUICIO—RENUNCIA *(Waiver)* Y CORRECCIÓN DE IRREGULARIDADES Y ERRORES—INSTRUCCIONES DE LA CORTE AL JURADO.—Cuando al terminar sus instrucciones la corte pregunta al acusado si tiene alguna instrucción más que someter al jurado y contesta que no, y no se toma objeción alguna a las instrucciones dadas y cuando las instrucciones finales curan cualquier defecto técnico cometido con anterioridad, no puede sostenerse que se ha cometido error perjudicial que lleve consigo la revocación de la sentencia.

SENTENCIA de *Rafael López Antongiorgi,* J. (Guayama), condenando al acusado a sufrir la pena capital por delito de asesinato en primer grado. *Confirmada.*

*C. Domínguez Rubio, Adolfo Porrata Doria, Pedro Anglade,* abogados del apelante; *José E. Figueras,* abogado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El presente es un caso de asesinato. El acusado fué declarado culpable y condenado a sufrir la pena de muerte, y solicita ahora, dentro de este recurso de apelación, que la sentencia se revoque y se ordene la celebración de un nuevo juicio, por los motivos que iremos examinando por el orden en que han sido alegados.

[1] La primera cuestión que se levanta se suscitó al comenzar el juicio. Pidió el acusado que la acusación fuera sobreseída por no haber sido presentada por un gran jurado, se opuso el fiscal y la corte declaró sin lugar la petición.

No invoca aquí el acusado su derecho a que intervenga en su causa un gran jurado como un derecho constitucional. Esta cuestión ha sido repetidamente resuelta y carecería de mérito alguno.

Lo que sostiene el acusado es:

1°. Que la Legislatura de Puerto Rico por su propio

acuerdo, en 1919, aprobó una ley estableciendo el gran jurado, cuya sección primera dice:

"Todos los delitos graves (*felonies*) deberán ser perseguidos mediante acusación del Gran Jurado presentada ante la corte que tenga jurisdicción en el caso.

"Todos los demás delitos podrán perseguirse en la forma prescrita por el Código de Enjuiciamiento Criminal."

Y 2° que esa ley está vigente y le concede el derecho de que intervenga en su causa, que lo es por delito grave, un gran jurado, porque la ley que se aplicó para negarle tal derecho es anticonstitucional y por consiguiente nula por ser contraria al artículo 2 del Acta Orgánica en cuanto le niega la igual protección de las leyes.

La ley a que se refiere el apelante es la 98 de 1925. Contiene sólo dos secciones que, copiadas a la letra, dicen:

"Sección 1.—Que la sección 1 de la Ley No. 58 de junio 18 de 1919, titulada 'Ley estableciendo el Gran Jurado, regulando sus procedimientos, facultades y deberes, determinando la forma de las acusaciones del Gran Jurado, la presentación y lectura de las mismas y los procedimientos subsiguientes a la presentación,' queda por la presente enmendada, de modo que lea así:

"Sección 1.—Todo delito grave (felony) que se impute a un funcionario público por razón de actos realizados en el ejercicio de sus funciones deberá ser perseguido mediante acusación del Gran Jurado presentada ante la corte que tenga jurisdicción en el caso.

"Todos los demás delitos se perseguirán en la forma prescrita por el Código de Enjuiciamiento Criminal."

¿Pudo la Legislatura decretarla? ¿Niega dicha ley la igual protección que garantizan la Carta Orgánica de Puerto Rico y la Constitución de los Estados Unidos?

Para sostener la nulidad de la ley invoca el apelante la siguiente doctrina que aparece en 12 Corpus Juris 1186. Es así:

"Es nulo un estatuto relativo a enjuiciamiento criminal que prescribe un modo de enjuiciar diferente tratándose de personas en igual situación, por equivaler ello a negar la igual protección de las leyes."

El texto de Corpus Juris se basa en el caso de *State* v. *Holland,* 37 Mont. 393 (96 P. 719).

En dicho caso se declaró nulo por ser contrario al precepto constitucional sobre el derecho a la igual protección de las leyes, el siguiente estatuto:

"Art. 1192.—Toda persona que voluntariamente usare la insignia del Gran Ejército de la República, la insignia, divisa o roseta de la Orden Militar de la Legión Leal de los Estados Unidos, o de la Orden Militar de las Guerras de los Estados Unidos con el Extranjero, o la insignia o botón de los veteranos Unidos de la Guerra Hispano-Americana, o de la Orden de los Patrocinadores de la Agricultura, o de la Benevolente y Protectora Orden de los Elks de los Estados Unidos de América, o de la Orden de los Caballeros de Pythias o de las Organizaciones del Trabajo, o de cualquier sociedad, orden u organización existente durante diez años en el estado de Montana, o usare el nombre de las mismas para obtener ayuda o protección dentro de este estado, o que voluntariamente usare el nombre de tal sociedad, orden u organización, el título de sus directores, o su insignia, rituales o ceremonias, a menos que tuviere derecho a usar los mismos de acuerdo con la constitución y estatutos, reglas y reglamentos de tal orden, o de tal sociedad, orden u organización, será culpable de delito menos grave y, de ser convicto, castigado con prisión en la cárcel del condado por un término no mayor de 90 días, o multa que no exceda de $200.00, o con tales multa y prisión, disponiéndose que ello no será aplicable a las esposas, hijas, hermanas o madres de los miembros de dichas órdenes que continúen dentro de ellas."

El razonamiento de la corte fué como sigue:

"También se sostiene que la ley es nula porque hace una clasificación arbitraria de ciudadanos que ocupan exactamente el mismo lugar en relación con la materia de que ella trata, y es por tanto ofensiva a la Enmienda Catorce de la Constitución federal. Creemos que esta contención también debe sostenerse. El disponiéndose hace excepción de las esposas, hijas, hermanas y madres de los miembros de cualquiera de estas sociedades que continúen dentro de ellas. ¿Por qué hacer esta excepción? La única respuesta es que se hizo por razones puramente sentimentales que influenciaron la mente del legislador, basadas en la idea de que las mujeres que tienen cierta relación jurídica o de consanguinidad con los miem-

bros ocupan una situación legal distinta con relación a la materia objeto de legislación. La frase 'igual protección de las leyes', significa iguales garantías bajo ellas para todo el mundo, en igualdad de condiciones, en cuanto a su vida, su libertad, su propiedad y la consecución de la felicidad, y exención de cargos mayores a los que se imponen por igual a todos los demás en igualdad de circunstancias. Por tanto, un estatuto que con uniformidad afecta por igual a todos los individuos de cada clase o a todos los distritos que se encuentren en iguales condiciones, no niega la igual protección de las leyes; pero tal clasificación no debe ser arbitraria ni carecer de fundamentos razonables.' (8 Cyc 1059) *E converso,* si un estatuto determinado distribuye sus cargas sin igualdad entre aquellos que ocupan la misma posición en relación con la materia de que trata, si castiga a un ciudadano por hacer algo que otro puede hacer con impunidad, si restringe la libertad del uno sin imponer igual limitación al otro, entonces no proporciona la 'igual protección de las leyes', o sea, la protección por leyes iguales, garantizada por la enmienda. 'La igual protección de las leyes es una promesa de la protección por leyes iguales.' (Yick Wo. v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.)

. ''En el caso de State v. Cudahy Packing Co., 33 Mont. 179, 114 Am. St. Rep. 804, 82 Pac. 833, esta Corte resolvió que un estatuto prohibiendo la formación de combinaciones o monopolios con el fin de adquirir el dominio sobre los precios de los productos o de destruir la competencia, que exceptuaba de sus disposiciones a las personas dedicadas a la horticultura o agricultura, era nulo por la razón de que afectaba de una manera desigual a distintas personas de la comunidad dedicadas a iguales o parecidas ocupaciones. En principio, aquel caso no puede distinguirse del presente.'' *State* v. *Holland,* 37 Mont. 406–7.

Lo que sigue diciendo Corpus Juris, resumiendo la jurisprudencia de los diferentes estados, es como sigue:

''Sin embargo, sujeta a esta limitación, la legislatura tiene un gran campo de discreción al prescribir las formas de enjuiciamiento criminal, y para proveer determinados modos de enjuiciar para determinadas clases de casos, y no puede resultar negativa alguna de la igual protección de las leyes de un juicio celebrado de acuerdo con válidas reglas de procedimiento así establecidas. De modo que no se niega la igual protección de las leyes por los estatutos que permiten que una persona sea procesada a discreción del fiscal por

uno u otro de dos delitos cometidos en el mismo acto; por un estatuto que en cuanto a delitos cometidos subsiguientemente alarga el tiempo dentro del cual pueden perseguirse, o que prescribe diferentes métodos de procedimiento en diferentes partes del estado, o que autoriza un arresto sin una orden por ciertos delitos, o que permite que mediante el permiso de la corte se presente una acusación sin un examen preliminar, o que prescribe determinada forma de acusación para determinado delito; por los estatutos que prescriben diferentes métodos para sortear los jurados en distintos casos, o en distintas partes del estado, o que fijan el número de recusaciones perentorias que es permitido en diferentes casos, o un número distinto de tales recusaciones en lugares de distintos tamaños, o que prescriben los fundamentos de tales recusaciones o el tiempo dentro del cual pueden hacerse; por una ley que dispone que ciertos errores no serán fundamento para una revocación, o concede un nuevo juicio a instancia de un acusado que ha sido convicto, o distintos derechos de apelación contra sentencias de diferentes cortes y en diferentes clases de casos, o que altera el personal de una corte de apelaciones después de establecida una apelación; ni tampoco la omisión de la ley de disponer una forma para obligar a los testigos del acusado que se encuentran fuera del estado a comparecer o de proveer un método para tomar y utilizar las deposiciones de tales testigos, constituye una negativa por parte del estado de la igual protección de las leyes. Así también, la legislatura puede prescribir que la prueba de un hecho sea prueba *prima facie* de otro hecho en tanto en cuanto exista alguna relación razonable entre el hecho probado y el hecho presumido. Un jurado designado para un acusado y recusado perentoriamente puede de nuevo ser designado para el mismo acusado en un juicio subsiguiente bajo la misma acusación sin privar al acusado de la igual protección de las leyes. Pero cualquier actuación de los funcionarios encargados de la selección de un jurado que constituya una distinción adversa a personas pertenecientes al mismo partido político que el acusado constituye una infracción de la garantía de la igual protección." 12 C. J. 1186-87.

Como puede verse, no se encuentra ningún caso igual al nuestro.

Hemos consultado a Cooley's Constitutional Limitations y nada hemos encontrado que directamente resuelva el problema concreto suscitado.

También a Black's Constitutional Law. Dedica varias páginas a examinar la garantía constitucional sobre la igual protección de las leyes y cita gran número de casos. Comienza diciendo que ''la cláusula no intenta conferir nuevos derechos, sino que simplemente prohibe cierta clase de acción o legislación por parte de los estados. Significa que a ninguna persona o clase de personas se les negará la misma protección de las leyes que se goza por otras personas o clase de personas similarmente situadas, siendo su objeto el prevenir distinciones arbitrarias e individuales y legislación de clases no fundada en una base legal y razonable de distinción.'' Y luego añade: ''la enmienda catorce no requiere que todas las personas tengan el derecho de una audiencia o juicio ante el mismo tribunal y estén investidas del mismo derecho de apelar; y una ley que actúe por igual sobre todas las personas bajo las mismas circunstancias, en esos respectos, satisface los requerimientos de la constitución.''

El texto enuncia principios que pueden guiarnos en la solución del problema, pero los hechos de los casos citados para sostenerlos presentan en verdad situaciones distintas.

Hasta donde nos ha sido dable estudiar la jurisprudencia, no hemos encontrado un caso igual al nuestro. Debemos, en tal virtud, penetrar por nosotros mismos en el problema y resolverlo de acuerdo con la letra y el espíritu de la garantía constitucional y con los principios generales establecidos en relación con ella.

Volvamos a la cita del propio apelante, esto es, a 12 Corpus Juris, 1186, y caso de *State* v. *Holland, supra.* No hay duda alguna de que la Ley No. 98 de 1925 sería nula si prescribiera un modo de enjuiciar diferente, tratándose de personas en igual situación.

Dicha ley establece en efecto un modo de enjuiciar diferente para los delitos cometidos por los funcionarios públicos en el ejercicio de sus funciones y para los perpetrados por los ciudadanos privados, pero ¿se encuentran dichas personas en igual situación?

No, a nuestro juicio. Si se hubiera prescrito por la Legislatura un método distinto para enjuiciar a los funcionarios públicos cuando cometieran cualquier delito común, estaríamos conformes en que se habría otorgado a los funcionarios un privilegio ilegal, pero la distinción que se establece es más bien entre delitos que entre personas, y siendo ello así no constituye una legislación de clases, no está en pugna con el Acta Orgánica y la Constitución y es por tanto permisible.

No debe perderse de vista que para llegar a la anterior conclusión se ha partido de la base de que el derecho a un gran jurado no es fundamental y puede ser concedido o negado, en forma general desde luego, por la Legislatura en el ejercicio de sus poderes regulares.

Además, la Legislatura en la ley de que se trata lo que hizo en verdad fué suprimir la actuación del gran jurado con ciertas excepciones, y si las excepciones son declaradas nulas por anticonstitucionales, el resultado sería que la institución del gran jurado dejaría de actuar para todos y en tal virtud ningún derecho tendría el acusado.

[2] La segunda cuestión que se levanta se refiere a la práctica de la evidencia. Ocurrió así:

El Fiscal terminó su prueba. Comenzó la suya la defensa presentando al testigo Manuel Barrios, quien dijo:

"Que se llama Manuel Barrios; que ejerce el cargo de policía insular; que allá para los días que sucedieron estos hechos se encontraba en Guayama; y que para entonces en unión del Jefe Quiñones arrestó a Pascual Ramos; que lo arrestó en los terrenos de la Central Lafayette cerca del pueblo de Arroyo; que tenía una herida en el cuello en el lado derecho; que habló con el acusado cuando venían para Guayama; que Pascual Ramos les manifestó en el curso. . . . . En ese instante el Fiscal hace la siguiente oposición.

"Hon. Fiscal:—Yo me voy a oponer ahora. Esa prueba la puede traer el Fiscal, pero no la defensa; yo no podría traer al acusado para ponerlo a declarar; la defensa puede traerlo como testigo. Esta es una prueba de referencia.

"Lcdo. Anglade:—Nosotros al traer al policía a declarar sobre estos extremos, es porque son hechos coetáneos con el suceso: son hechos que caen dentro del *res gestae*.

"Hon. Juez:—La Corte declara con lugar la oposición.

"Lcdo. Anglade:—Nosotros respetuosamente tomamos excepción de la resolución de la Corte.

"Sigue contestando el testigo:—Que Pascual Ramos traía una herida al lado derecho del cuello; que esa herida no sangraba en el momento del arresto.; que esa herida era de aquel mismo día como de hacía una o dos horas; que él no lo puede apreciar con certeza; que el acusado traía sangre en la camiseta; que en la camiseta tenía unas gotas de sangre; que vestía gabán, pantalón y camiseta; que lo arrestó como a las dos de la tarde más o menos.

"Preguntado por el Jurado:—Que cuando arrestó al acusado éste tenía un machete y que el machete tenía huellas de sangre.

"Repreguntado por la Defensa continúa declarando: Que no puede decirle si Pascual Ramos llevaba camisa antes de aquel momento en que el Jefe Quiñones y el testigo lo arrestaron; que tenía gabán, pantalón y camiseta; que en ese momento no tenía camisa."

Como puede verse, el acusado se creyó con derecho a presentar la declaración del guardia Barrios por considerarla como parte de la *res gestae*. Es evidente que no lo era. Las manifestaciones que el acusado hizo al Jefe Quiñones y al guardia Barrios lo fueron horas después del suceso, cuando había tenido tiempo de reflexionar sobre el mismo, y en sitio y ocasión distintos. La corte no cometió, pues, el error que se le atribuye.

El acusado pudo quizá haber insistido en presentar sus manifestaciones por medio de la declaración de Barrios alegando que lo hacía para contradecir la declaración de Quiñones, pero no sometió la cuestión de tal modo, ni consta en forma alguna que la declaración de Barrios hubiera contradicho en verdad la de Quiñones.

De todos modos no puede estimarse que la negativa hubiera sido perjudicial al acusado. Este declaró en la forma que veremos en seguida. La declaración de Quiñones será transcrita después de la del acusado. Conocemos lo que llegó a decir el guardia Barrios. Si lo comparamos todo tendre-

mos que concluir que el hecho de la herida que tenía el acusado fué corroborado tanto por Quiñones como por Barrios y que las manifestaciones del acusado con respecto a cómo recibió su herida y a que hubo lucha y actuó en legítima defensa y a que eso fué lo que dijo al ser arrestado, están en un todo corroboradas por Quiñones, y no vamos a suponer que Barrios pudiera haber dicho más de lo que dijo el propio acusado. Siendo ello así, su declaración hubiera resultado simplemente acumulativa.

El acusado declaró:

"Que se llama Pascual Ramos; que es vecino de Guayama; que conoce a Carlos Rossó; que allá para el 23 de diciembre del año pasado le ocurrió algo al acusado con Carlos Rossó; que por la tarde del día anterior tuvieron una discusión el acusado y el interfecto; que esa discusión fué por mor del trabajo; que el acusado había trabajado dos noches antes y la noche esa lo indispuso con el principal y le dijo que él era el que iba a trabajar por la noche y que si no era él que sería Andrés Delgado; que esa misma tarde le dijo Carlos Rossó al acusado que lo tenía que sacar de allí al acusado con los pies para alante y el interfecto le dijo al testigo que se largara de allí; que el testigo estaba desahuciado de allí; que el testigo siguió trabajando y trabajó el domingo en la noche y el lunes en la noche y el martes fué que lo sacaron de la colocación; que fué el martes por la noche; que el día 23 de diciembre por la mañana el acusado iba a buscar trabajo donde el capataz del Riego Enrique Ortiz; que se encontró con Manuel Vázquez; que en la colonia Sabater vió al amanecer a Carlos Rossó; que luego como a las diez de la mañana cuando sucedieron los hechos Carlos Rossó estaba en la colonia Sabater; que lo que sucedió allí en el caso del testigo y de Carlos Rossó fué que el testigo llegó como a las diez de la mañana donde estaban ellos trabajando y que el testigo fué a coger un pedacito de tabla y el interfecto le dijo "¿qué es lo que Ud. (al acusado) busca aquí?"—"Ya te puedes ir que tú estás desahuciado de aquí."—Que el testigo le contestó que él iba donde el principal a buscar trabajo; que entonces el interfecto le volvió a decir que se podía ir de allí, que estaba desahuciado de allí; que lo empuñó por el brazo; que el interfecto tenía un machete en la mano y cuando él llegó a coger el pedacito de tabla le dijo al testigo "ya te puede haber ido de aquí que

estás desahuciado,'' y lo agarró así: que entre el interfecto y el acusado hubo lucha; que el interfecto le tiró al testigo con el machete y alcanzó con la punta aquí (señalando al cuello) y ya como el testigo se encontraba herido le tiró con el machete de planazo, pero sin intención de cortarlo y el machete se viró y lo cortó; que el testigo fué allí a buscar los pedacitos de madera para cocinar.

"Repreguntado por el Lcdo. Porrata:—Que el acusado tiró con su perrillo después de estar herido; que el interfecto se abalanzó sobre el acusado quien le extrañó el cuerpo y cuando se sintió el acusado herido fué que le tiró a dar así pero que el testigo le tiró de planazo y se viró el machete; que la lucha fué rápida; que Cándido Ortiz estaba dentro del almacén sacando la madera cuando sucedía esto; que cuando la lucha Cándido Ortiz estaba dentro del almacén; que Rosendo Moreno estaba recostado en un carro mirando para adentro del almacén a donde estaba Cándido Ortiz y al rato fué que miró saliendo entonces Cándido Ortiz para afuera.

"Repreguntado por el Hon. Fiscal:—Que tuvo unas palabras un día antes con Carlos Rossó; que no fueron tres días antes; que trabajó dos días por la tarde; que el interfecto lo mandó a buscar por motivo de haberlo desahuciado del trabajo; que quien lo desahució del trabajo fué el mayordomo Juan Sabater, pero fué porque lo indispuso el interfecto; que él está seguro que fué el interfecto quien lo indispuso porque era el único que le tenía tirria; que al otro día no tuvieron una discusión; que al día siguiente de la discusión fué que sucedió el caso; que el interfecto le tiró con el machete así; que el acusado entonces le empuñó la mano con la mano izquierda y le tiró con la mano derecha; que cuando le dió a Rossó cayó el machete al suelo al pié de él; que Rossó cayó al lado de la carreta; como a tres cuartas de retirado de la carreta.

"Repreguntado por el Jurado:—Que la herida del acusado fué en el lado derecho; que Carlos Rossó le tiró con la mano derecha en esta forma porque el testigo estaba en estas condiciones; el interfecto estaba en este lado, seguida me tiró y me cogió con la punta del machete; que el interfecto estaba al lado del testigo.— La defensa cierra su caso.''

## Y el Jefe Quiñones:

"Que se llama Fernando Quiñones; que es Jefe de Distrito de la Policía Insular; que el día 23 de diciembre del año pasado prestaba su servicio en Guayama; que ese día tuvo conocimiento de haberse cometido un crimen en esta jurisdicción; que se constituyó

en la colonia Sabater de Guayama porque allí había ocurrido un crimen; que vió el cadáver de un hombre trigueño que tenía una herida en el cuello; que allí había un carro de bueyes y el hombre tenía las piernas enganchadas en la lanza del carro y la cabeza en la tierra y debajo de las piernas y la lanza estaba un machete; que el machete que se le presenta era el que estaba entre la lanza y las piernas del muerto; que después como a las dos de la tarde fué arrestado el acusado en la jurisdicción de Arroyo, en la colonia Cora de Arroyo, llegando cerca de casa de una hermana de él; que el crimen fué cometido entre diez y once de la mañana y como a las dos de la tarde se practicó el arresto; que al arrestar al acusado le ocuparon un machete que tenía en las manos; que el machete que se le ocupó es el que se le presenta; que le manifestó que había herido a Carlos Rossó con ese machete. Que le hizo otras manifestaciones; que esas otras manifestaciones fueron obtenidas voluntariamente; que él venía hablando; que estaba contando eso sin que él se lo preguntara; que él no lo amenazó para que hiciera esas manifestaciones; que el acusado le dijo que estaba de guardia en la colonia Sabater, custodiando unos almacenes y que lo habían despedido del trabajo por indisposiciones del muerto; que él había tenido un disgusto con el muerto y que el muerto le había tirado un machetazo y lo había herido en el cuello.

"Repreguntado por la defensa:—Que el acusado le confesó que entre el muerto y el acusado habían tenido un disgusto; que no explicó cómo fué el disgusto, pero que el acusado le dijo que habían tenido un disgusto y que el muerto le tiró y le cortó el cuello (señalando la parte derecha del cuello) y que él entonces le había tirado; que el acusado tenía una herida en la parte derecha del cuello; que el testigo llevó al acusado al hospital después de haberlo llevado al cuartel; que el acusado le confesó efectivamente que entre ellos había habido un disgusto y que el muerto le había tirado."

3. Ya que nos hemos referido a la prueba de la defensa y prácticamente la hemos transcrito toda, para formar un acabado concepto del caso y para estudiar con más seguridad los otros errores señalados, nos parece conveniente referirnos a la prueba de cargo.

Se trata de un caso grave, como que se impuso la pena de muerte al acusado, pero no complicado en materia de evidencia.

El primer testigo que declaró por parte del Pueblo fué el Doctor Bonelli, médico-cirujano que practicó la autopsia de Rossó. Dijo que Rossó "era un hombre como de setenta años de edad aproximadamente, mulato, de estatura muscular medianamente desarrollada . . . . que presentaba como única lesión exterior una herida producida con arma blanca al nivel de la región cervical media y en dirección de atrás hacia adelante, extendiéndose desde la masa muscular posterior cervical izquierda hasta el ángulo del ramo ascendente de la mandíbula derecha; que la cabeza del interfecto quedaba adherida al cuerpo solamente por la masa muscular del cuello; que esta herida . . . . dividió transversalmente la columna vertebral y la médula al nivel de la tercera vértebra cervical; . . . . que la causa directa de la muerte fué a consecuencia de la división de la médula y los grandes vasos sanguíneos; que esa herida fué producida probablemente por un machete; que la muerte se produjo instantáneamente; . . . . que la posición probable en que se encontraba la víctima cuando recibió la herida era de espalda porque si le da de frente, le hubiera herido al frente derecho; que cree que la herida fué dada de espalda por la dirección de la herida y sobre todo por el alcance que tuvo."

Declaró también el doctor Bonelli que examinó al acusado en el momento en que la policía lo condujo al hospital, que "tenía una herida superficial en la piel del cuello como de dos pulgadas de longitud, . . . . que esa herida fué producida con un instrumento corto porque un machete, dado el plano que tiene, le hubiera producido una herida más larga, . . . . que la herida solamente hubiera podido ser con un machete en estas condiciones (cogiendo el machete por sus extremos y con ambas manos) que al hacer así hubiera podido producirse un rasguño con el filo de la punta del machete, que la herida no pudo producirse en una lucha, y que el testigo se inclina a creer que fué con un instrumento corto."

Las anteriores contestaciones lo fueron a preguntas del

Fiscal sin objeción alguna por parte de la Defensa. Esta sin embargo repreguntó ampliamente al testigo. El resultado obtenido no hizo variar el del interrogatorio directo.

Después del Doctor declararon Cándido Ortiz y Rosendo Moreno, testigos presenciales. Todo lo que dijeron, fué así:

"Cándido Ortiz, declara bajo juramento examinado por el Hon. Fiscal:—Que se llama Cándido Ortiz; que vive en Guayama en la calle de la Palma; que el 23 de diciembre del año pasado trabajaba en Sabater, en una colonia de caña de Guayama; que trabajaba de carpintero componiendo los carros de cargar caña; que había ayudándolo un trabajador que se llamaba Carlos Rossó; que el machete que le presentan es el de Carlos Rossó; que Carlos Rossó lo usaba para limpiar las estacas; que después de limpiar las estacas Carlos Rossó ponía el machete en el suelo; que vió por allí ese día a Pascual Ramos paseándose con un machete en la mano derecha; que Ramos no habló con él ni con Carlos Rossó; que allí mataron a Carlos Rossó; que lo mató Pascual Ramos; que el testigo le dijo a Carlos "qué vamos a hacer ahora", y Carlos Rossó le dijo "vamos a quitar la lanza del carro para ponerle una nueva", y le dijo "bueno, pues levanta un poquito la lanza para sacar el tornillo"; que Rossó se bajó para levantar la lanza, y en eso brincó el acusado y le partió el pescuezo; que no hubo palabras ni lucha entre ellos; que el testigo estaba al lado de Carlos Rossó; que Carlos Rossó cayó al suelo al lado de la pieza que estaba cogiendo con el pescuezo en la tierra y las dos manos debajo sin decir nada; que el acusado se fué en seguida y que el testigo no lo vió herido.

"Repreguntado por el Ledo. Porrata:—Que Carlos Rossó hacía guardia de día de seis a seis; que no sabe los días que trabajaba en la semana; que quería el machete para hacer guardia; que hacía como veinte años que conocía a Carlos Rossó; que no conocía a Pascual Ramos; que había visto a Pascual Ramos; que Pascual Ramos hacía guardia de noche y Carlos Rossó era guardia de día; que eso ocurrió de diez a once de la mañana; que antes de dar la herida Pascual Ramos se paseó como cuarenta minutos más o menos que se paseaba de derecha a izquierda; que ni Carlos Rossó ni él le dirigieron la palabra; que ellos no se inquietaron; que llevaba un machete en la mano derecha; que no hizo ningún ademán durante esos cuarenta minutos; que al testigo no le inquietó ver a Pascual Ramos paseándose cuarenta minutos sin decir una palabra; que no es cierto que el testigo estuviera en el almacén cuando ocu-

rrió la muerte; que Pascual Ramos, el testigo y Carlos Rossó estaban cerquita; que estaban los tres juntos; que el testigo no sabe si entre Pascual Ramos y Carlos Rossó había habido garatas por causa del trabajo; que él no sabe si el día anterior hubo una pelea entre Carlos Rossó y Pascual; que no se entera de lo que ocurre en la colonia porque el testigo vive en el pueblo; que estaban los tres solos; que allí no hubo lucha entre Pascual y Rossó.

"Rosendo Moreno:—Declara bajo juramento examinado por el Hon. Fiscal:—Que se llama Rosendo Moreno; que vive en la Reunión; que el día 23 de diciembre del año pasado estaba en Sabater, en la colonia esa de las Mercedes en Guayama; que vió a Cándido Ortiz, que también vió a Carlos Rossó; que Cándido Ortiz estaba poniéndole un tarugo a la botavara de un carro y Carlos Rossó le ayudaba; que vió por allí al acusado; que tenía un perrillo en las manos; que cuando Carlos Rossó iba a levantar la botavara del carro llegó Pascual Ramos y le dió un tajo; que se lo dió con ese perrillo; que le dió así (bajándose); que después de darle el tajo el acusado siguió andando; que el muerto nada dijo al caer; que antes del machetazo el testigo vió al carpintero, al muerto y a Pascual; que cuando él estaba allí presente no hubo provocación alguna; que tampoco hubo lucha; que eso ocurrió en el barrio Las Mareas en la colonia Mercedes de Guayama.

"Repreguntado por la defensa (Lcdo. Porrata):—Que el testigo estaba en la Mercedes; que estaba en la parte de arriba de un carro; que estaba sentado; que como no estaba trabajando ese día y el testigo tenía una hermana en Sabater fué a verla; que el testigo vive en la Reunión; que su hermana no estaba sentada cerca del carro; que estuvo sentado en el carro como quince minutos; que después de estar él allí fué que llegó Pascual Ramos; que llegó como cinco o seis minutos después; que Pascual estuvo menos tiempo que él allí, que Pascual no había dicho nada, nada más hasta que lo mató; que Pascual venía de las casitas; que Pascual antes de darle el machetazo se paró como seis minutos; que estuvo parado y no se movió hasta dar el machetazo; que Cándido Ortiz era el carpintero allí; que Cándido estaba poniéndole una botavara al carro; que el muerto estaba allí ayudándole al carpintero, aguzando unas estacas; que conoce al acusado como ocho o diez años; que mientras estuvo ese día allí no hubo garata entre ellos; que el acusado y el muerto eran ambos celadores, uno de día y otro de noche; que el acusado estaba despedido de allí; que antes de despedirlo trabajaba de noche.

"Repreguntado por el Jurado:—Que allí estaban el muerto, Cándido Ortiz, Pascual Ramos y el testigo, ellos cuatro solamente; que el testigo estaba a una distancia más o menos que la que ocupa el espacio de un carro de caña; que los carros estaban uno al lado del otro." ·

Sólo tres testigos más declararon, a saber: Alfaro Saldaña, Fernando Quiñones y Andrea González.

Conocemos la declaración de Quiñones. Saldaña dijo que oyó gritar el día del suceso que habían matado a Rossó y decir que el matador era Ramos. La Defensa se opuso. El Fiscal explicó y no se tomó excepción. Manifestó también Saldaña que vió pasar al acusado y le dijo: "mira, párate, qué tú has hecho", que "no le contestó nada; que Pascual siguió; que iba andando; que su ropa iba bien; que no lo vió herido."

Andrea González fué la última testigo del fiscal. Transcribiremos íntegra su declaración con los incidentes ocurridos con motivo de la misma.

"Que se llama Andrea González; que el día 23 de diciembre del año pasado estaba en su casa; que su casa queda en la colonia Sabater del pueblo de Juana Díaz (es Guayama); que vive en la colonia Sabater; que conoce a Pascual Ramos; que lo vió esa mañana pasar por su casa; que venía un poco ligero y traía un machete en la mano; que se fijó en la ropa del acusado; que venía limpio.

"Lcdo. Porrata:—Vamos a oponernos a todas estas preguntas porque no forman parte del res gestae.

"Hon. Juez:—La testigo ha declarado que vió a Pascual Ramos el día 23 de diciembre del año pasado, por la mañana. Puede contestar.

"Que Pascual Ramos pasó frente al hogar de su casa entre diez y once de la mañana; que iba muy ligero—que llevaba un machete en la mano; que no le vió herida alguna; que al momento que él pasaba oyó los gritos.

"¿Qué oyó Ud. decir?—Que Pascual Ramos había matado a Apán (Carlos Rossó).—En este momento la defensa interviene:

"Lcdo. Porrata:—Nos oponemos a que declare lo que oyó decir a no ser que sea un *dying declaration*.

"Hon. Juez:—La testigo no declara que el acusado hubiera matado al otro, sino que oyó decir que mataron a otro.

"Continúa la testigo contestando a preguntas del Fiscal:—Que oyó decir eso.

"Repreguntada por el Lcdo. Porrata:—Que ella estaba en el hogar de su casa; que no estaba en el batey; que estaba mirando por una ventana; que estaba distrayendo la vista; que acostumbra distraer la vista a cualquier hora del día; que conoce a Pascual Ramos; que han tenido palabras; que de anteriormente no le conocía; que las palabras que ha tenido con Pascual Ramos son igual que tener una entrevista con cualquier clase de persona y hablar dos o tres palabras; que estaba en una ventana en la última casita de arriba; que no conoce a Alfaro Saldaña; que la primera vez que lo ve es hoy y el primer día que fué a trabajar en la hacienda; que en el hogar de su casa le pertenece estar al esposo de la testigo; que no vió por allí a Alfaro Saldaña; que el acusado cogió el callejón arriba frente del hogar de la casa de la testigo; que venía hacia Guayama; que la casa de la testigo queda a la derecha; que no conversó con Pascual Ramos quien venía tranqueando; que si Pascual hubiera tenido una herida en el otro lado lo hubiera notado; que no la llevaba porque ella se fijó en la ropa; que ella se fijó en él porque pasó como nunca pasaba; pero no se fijó si iba herido porque lo único que traía en la mano era un machete; que la testigo no es parienta de la mujer de Carlos Rossó; que son amigas íntimas; que no viven juntas; que viven como a media cuerda de retirado."

Tal fué la prueba practicada a la que volveremos a referirnos cuando sea oportuno.

[3] 4. Antes de dictarse la sentencia, por medio de una moción *"in arrest of judgment"*, el acusado suscitó la cuestión de que la pena de muerte no existía en Puerto Rico. La corte declaró la moción sin lugar y su resolución se señala como errónea. Después de las decisiones de esta corte en el caso de *El Pueblo* v. *Arrocho,* 34 D.P.R. 847 y de la Corte de Circuito de Apelaciones del Primer Circuito en la apelación establecida en el dicho caso de Arrocho, y de la desestimación por la Corte Suprema de los Estados Unidos de la petición de *certiorari* contra la expresada senten-

cia de la Corte de Circuito, sólo cabe decir que es una cuestión resuelta que existe en Puerto Rico la pena capital.

[4] 5. Como otro error se señala la desestimación por parte de la corte de otra moción presentada por el acusado alegando que "en la insaculación del jurado que actuó en el caso hubo una completa irregularidad . . . . por cuanto sin que se hubiera agotado el panel ordinario y sin que hubiera una orden expresa de la corte ordenando que el primero y segundo panel extraordinario fuere puesto en la urna se depositó en ella por el secretario el panel regular ordinario y el primer y segundo panel extraordinario, y éste procedió a extraer de la urna los jurados que juzgaron al acusado."

La contención carece de mérito. La moción se presentó varios días después de haberse celebrado el juicio. De la exposición del caso resulta que los caballeros del jurado que intervinieron en la causa fueron aceptados expresamente por las partes. Aunque no existieran esas circunstancias, no se habría cometido el error señalado. Un caso semejante fué resuelto por esta Corte en contra de lo que sostiene el apelante. Nos referimos al de *El Pueblo* v. *Juliá,* 25 D.P.R. 258, en el que esta corte, por medio del Juez Asociado, Sr. Wolf, dijo:

"El hecho de que el juez ordene que se sortee un nuevo panel de veinte y cuatro jurados y los combine con otros jurados regulares sorteados primeramente por resultar que varios de éstos fueron recusados por haber tomado parte en una causa semejante, de manera que había más de treinta jurados constituídos, no es una infracción del artículo 199 del Código de Enjuiciamiento Criminal que limita el número de jurados a veinte y cuatro, pues de acuerdo con el artículo 202 del mismo código el juez tiene amplia discreción sobre el particular. La jurisprudencia demuestra que un mayor número de jurados no perjudica al acusado, que los estatutos semejantes son meramente directorios, y que no se revocará la sentencia, a no ser que haya abuso o perjuicio." 25 D.P.R. 258.

6. Por este señalamiento se suscitó la misma cuestión relativa a la pena de muerte. Se presentó una "moción para

vacar la sentencia" basándose en que dicha pena no existía y fué declarada propiamente sin lugar.

7. Sostiene el apelante que la Corte erró al no concederle un nuevo juicio.

Hemos examinado cuidadosamente la solicitud. Contiene varios fundamentos. Algunos han sido ya estudiados en esta opinión. Limitaremos nuestro examen a aquellos que no han sido objeto de estudio.

[5, 6] *a.* Se alega que aunque no se tomó objeción a la declaración del doctor Bonelli, dicha declaración era inadmisible y no debió ser permitida por la corte, citándose varias autoridades que sostienen que la opinión de médicos con respecto a la posición relativa de las partes en los momentos de verificarse el ataque, o la herida, o los disparos, no es admisible.

La objeción y la excepción eran necesarias. Además, si bien no puede negarse que el doctor Bonelli declaró en el sentido indicado, los únicos dos testigos presenciales del suceso colocan a las partes en la misma posición. No hubo perjuicio. Para un estudio más amplio de esta materia, véase el caso de *El Pueblo* v. *Collazo,* 33 D.P.R. 49.

[7] *b.* Se queja también el apelante de que se permitiera declarar a la testigo Andrea González en la forma en que lo hizo.

A nuestro juicio su declaración era permisible, pero aunque así no fuere no se tomó la debida excepción ni puede considerarse como perjudicial.

[8] *c.* Se alegó que se había descubierto nueva prueba y se presentaron en efecto varios *affidavits* de personas que estaban dispuestas a declarar. Los hemos examinado. Manifiestan todos que Ramos y Rossó eran celadores de la factoría Molinaris, el primero de noche y el segundo de día; que existían disgustos entre ellos; que vieron cuando una madrugada Ramos entró a un velorio dejando su linterna fuera y Rossó se la llevó; que Rossó encomendó a Andrés Delgado que llamara a Ramos y cuando ambos fueron Rossó

dijo a Ramos que entregara la guardia a Delgado, que José Colón sostuvo delante de Rossó que Rossó le había hurtado la linterna a Ramos.

Ninguna de la prueba presentada como nuevamente descubierta se refiere a cómo ocurrió el hecho, sino a los motivos. El acusado admite que mató a Rossó. Más que favorable adversa hubiera sido esa nueva prueba pues tiende a demostrar que el resentido era Ramos y no Rossó, ya que Ramos fué el despedido de su trabajo según él a virtud de haberlo Rossó indispuesto con su principal.

[9] *d*. Se alegó que el veredicto era contrario a la prueba. Si el jurado creyó, como es evidente que creyó, las declaraciones de los dos únicos testigos presenciales que ya conocemos, no puede imaginarse una evidencia más clara y congruente con el cargo imputado.

Ramos se encontraba cerca de Rossó armado de un perrillo, Rossó trabajaba y cuando se inclinó quedando de espaldas a Ramos, éste saltó y le dió tan tremendo machetazo que le dividió transversalmente la columna vertebral quedando su cabeza adherida al cuerpo solamente por la masa muscular y muriendo a consecuencia de la herida al instante.

Sólo están contradichas las declaraciones de los dos testigos presenciales por la del acusado y por la herida que éste mostraba en el cuello al ser arrestado.

El jurado resolvió el conflicto y nada existe que pueda llevarnos a concluir que no actuara de acuerdo con la ley y la justicia. Al contrario un análisis concienzudo de la própia declaración del acusado, nos lleva a la conclusión de que actuó derechamente. El mismo acusado pudo inferirse la herida superficial que mostraba como base para su defensa. Las declaraciones de Alfaro Saldaña y Andrea González corroboran las de los testigos presenciales en el extremo de que Ramos no fué herido por Rossó.

La moción de nuevo juicio fué propiamente declarada sin lugar.

[10] 7. Procederemos ahora a considerar el último de los errores señalados. El relativo a las instrucciones de la corte al jurado.

Se sostiene que dichas instrucciones fueron erróneas y contradictorias en cuanto trataron de definir el asesinato en primer grado y el asesinato en segundo grado y necesariamente produjeron confusión en la mente del jurado.

También se sostiene que es totalmente errónea la instrucción que sigue:

"El acusado puede o no declarar, según precepto expreso de la Ley, y el hecho de que no declare, en este caso el acusado ha declarado, no implica nada en su contra; ni perjudica ni favorece al acusado."

Al terminar sus instrucciones el juez se dirigió a los abogados del acusado y al Fiscal y les preguntó si tenían algunas más que someter y contestaron que no. Ninguna objeción fué tomada. Leídas en general las instrucciones, producen la impresión de que fueron todo lo amplias y justas que la ley requiere. Comienzan refiriéndose a la acusación. Luego lo hacen a la prueba que se extracta de modo imparcial incluyendo la declaración del acusado. Se establece con toda claridad cuál era la defensa alegada por el acusado y se entra entonces en la definición del asesinato en sus dos grados, del homicidio, de la defensa propia, de la duda razonable, etc., etc., y terminan así:

"Si por el resultado de la prueba practicada, vosotros habéis llegado a la conclusión de que el acusado Pascual Ramos dió muerte de una manera ilegal y voluntaria, con malicia premeditada y con deliberación a Carlos Rossó ese día que se refiere en la acusación, o sea el 23 de diciembre de 1925, entonces es vuestro deber declarar a este acusado culpable de un delito de asesinato en Primer Grado.

"Si asimismo y por el resultado de esa misma prueba vosotros creéis que este acusado Pascual Ramos dió muerte a Carlos Rossó de una manera ilegal y voluntaria, con malicia premeditada o tácita, pero que no existe la deliberación, entonces es vuestro deber declarar a este acusado culpable de un delito de Asesinato en Segundo Grado.

"Si vosotros por el resultado de esa misma prueba creéis que este acusado Pascual Ramos no cometió los hechos que el Fiscal le imputa en la acusación, entonces es vuestro deber absolver a este acusado.

"También es vuestro deber absolver a este acusado si vosotros por el resultado de la prueba practicada tenéis duda en cuanto a su culpabilidad, la duda razonable de que ya les he hablado, entonces debéis dar el beneficio de esa duda a su favor y declararlo no culpable.

"Asimismo señores del Jurado, si vosotros creéis por el resultado de la prueba que este acusado Pascual Ramos, al dar muerte a Carlos Rossó lo hizo en legítima defensa propia, bien porque él creyese que su vida estaba en inmediato e inminente peligro de muerte, o bien porque creyese que estaba expuesto a sufrir grave daño corporal, entonces también es vuestro deber declarar a este acusado no culpable."

Es cierto que se observan algunas faltas y contradicciones en las manifestaciones del juez relativas al asesinato en primero y segundo grado y a la malicia expresa y a la tácita, pero creemos firmemente que no produjeron impresión en el jurado y que la parte final, que es correcta, curó cualquier defecto técnico que pudiera anteriormente haberse cometido.

Lo que más nos ha hecho dudar es la instrucción relativa a la declaración del acusado. Parece que el juez tenía preparadas de antemano las instrucciones que son comunes generalmente a todos los casos y leyó la relativa al derecho del acusado a declarar o no. Se acordó después de empezar que el acusado había declarado y en vez de eliminar por innecesaria la instrucción, siguió leyendo, limitándose a intercalar el hecho de la declaración del acusado.

¿Qué influencia pudo tener esa actitud del juez en el veredicto del jurado?

Se quiere sostener que las últimas palabras de la instrucción "ni perjudica ni favorece al acusado" se refieren a la declaración por él prestada.

Es imposible admitir tal interpretación, pero la verdad es que ya que el juez comenzó a leer y leyó una instrucción innecesaria, debió completarla diciendo que cuando el acusado declara, el jurado debe apreciar su declaración lo mismo que la de cualquier otro testigo, pudiendo desde luego el jurado al pesarla tomar en cuenta el interés que naturalmente pueda tener el acusado en su propia causa.

A no ser porque del tono general de las instrucciones se deduce que el juez se refirió a la declaración del acusado exactamente lo mismo que a las otras pruebas, consideraríamos este error como uno de verdadera importancia y trascendencia en la resolución del recurso.

Por virtud de todo lo expuesto, *debe confirmarse la sentencia recurrida.*